UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA

v.

D-1 FRANCISCO PATINO, M.D.

Defendant.
_____/

Case:2:18-cr-20451
Judge: Roberts, Victoria A.
MJ: Grand, David R.
Filed: 06-26-2018 At 01:18 PM
SEALED MATTER (dat)

VIO:  18 U.S.C. § 1349
18 U.S.C. § 1347
18 U.S.C. § 371
42 U.S.C. § 1320a-7b(b)(1)(A)-(B)
18 U.S.C. § 2

## INDICTMENT

THE GRAND JURY CHARGES:

### General Allegations

At all times relevant to this Indictment:

### The Medicare Program

1.    The Medicare program was a federal health care program providing benefits to persons who were 65 years or older, or disabled.   Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

2.      Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

3.      Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D).

4.      Specifically, Part A of the Medicare program covered inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation.

5.      Part B of the Medicare program covered the cost of physicians' services, medical equipment and supplies, and diagnostic laboratory services. Specifically, Part B covered medically necessary physician office services, outpatient physical therapy services, nerve conduction testing, ultrasounds, and nerve block injections, including facet joint injections. Part B also covered services that were provided in connection with a laboratory testing facility, including urine drug testing.

6.      National Government Services ("NGS") administered the Medicare Part A program for claims arising in the State of Michigan. Wisconsin Physicians Service ("WPS") administered the Medicare Part B program for claims arising in the State of Michigan. Palmetto GBA ("Palmetto") administered the Medicare Part B program for claims arising in the State of Nevada until September 20, 2012, when it was replaced by Noridian Administrative Services ("NAS"). CMS contracted with NGS to receive, adjudicate, process, and pay Part A claims. CMS contracted with

2

WPS, Palmetto, and NAS to receive, adjudicate, process, and pay Part B claims, including medical services related to physician office services, outpatient physical therapy services, and nerve block injections, including facet joint injections, as well as services that were provided in connection with a laboratory testing facility, including urine drug testing.

7.     TrustSolutions LLC was the Program Safeguard Contractor for Medicare Part A and Part B in the State of Michigan until April 24, 2012, when it was replaced by Cahaba Safeguard Administrators LLC as the Zone Program Integrity Contractor ("ZPIC").   Cahaba was replaced by AdvancedMed in May 2015.  Safeguard Services ("SGS") was the ZPIC for the State of Nevada.

8.     The Program Safeguard Contractor or ZPIC is a contractor that investigates fraud, waste, and abuse.   As part of an investigation, the Program Safeguard Contractor or ZPIC may conduct a clinical review of medical records to ensure that payment is made only for services that meet all Medicare coverage and medical necessity requirements.

9.     Payments under the Medicare program were often made directly to a provider of the goods or services, rather than to a Medicare beneficiary.   This payment occurred when the provider submitted the claim to Medicare for payment, either directly or through a billing company.

10.    Upon certification, the medical provider, whether a clinic, physician, or other health care provider that provided services to Medicare beneficiaries, was able to apply for a Medicare Provider Identification Number ("PIN") for billing purposes. In its enrollment application, a provider was required to disclose to Medicare any person or company who held an ownership interest of 5% or more or who had managing control of the provider. A health care provider who was assigned a Medicare PIN and provided services to beneficiaries was able to submit claims for reimbursement to the Medicare contractor/carrier that included the PIN assigned to that medical provider.

11.    A Medicare claim was required to set forth, among other things, the beneficiary's name, the date the services were provided, the cost of the services, and the name and identification number of the physician or other health care provider who had ordered the services. When an individual medical provider was associated with a clinic and medically necessary services were provided at that clinic's location, Medicare Part B required that the individual provider numbers associated with the clinic and rendering provider be placed on the claim submitted to the Medicare contractor.

12.    By becoming a participating provider in Medicare, enrolled providers agreed to abide by the policies and procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers, together with their

4

authorized agents, employees, and contractors, were required to abide by all provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules, and regulations issued by CMS and its authorized agents and contractors. Health care providers were given and provided with online access to Medicare manuals and services bulletins describing proper billing procedures and billing rules and regulations.

13. Health care providers could only submit claims to Medicare for reasonable and medically necessary services that they rendered. Medicare would not pay claims procured through kickbacks and bribes.

14. Medicare regulations required health care providers enrolled with Medicare to maintain complete and accurate patient medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the physician. Medicare requires complete and accurate patient medical records so that Medicare may verify that the services were provided as described on the claim form. These records were required to be sufficient to permit Medicare, through WPS and other contractors, to review the appropriateness of Medicare payments made to the health care provider.

15. Under Medicare Part B, physician office visit services, outpatient physical therapy services, nerve conduction, and nerve block injections, including

facet joint injections, were required to be reasonable and medically necessary for the treatment or diagnosis of the patient's illness or injury. Individuals providing these services were required to have the appropriate training, qualifications, and licenses to provide such services. Providers were required to: (1) document the medical necessity of these services; (2) document the date the service was performed; (3) identify the provider who performed the service; and (4) identify the clinic, physician office, or group practice where the provider provided the service. Providers conveyed this information to Medicare by submitting claims using billing codes and modifiers. To be reimbursed from Medicare for physician office visit services, outpatient physical therapy services, nerve conduction, and nerve block injections, including facet joint injections, the services had to be reasonable, medically necessary, documented, and actually provided as represented to Medicare.

16.    Under Medicare Part B, for a laboratory to properly bill and be paid by Medicare for laboratory testing, including urine drug testing, the patient must, among other things, qualify for the testing, including urine drug testing, under Medicare's established rules and regulations. The testing also must be rendered according to Medicare's rules and regulations, and certain documents must be completed before a claim is submitted for reimbursement to Medicare.

17.    For a laboratory to properly bill and be paid by Medicare for urine drug testing, the urine drug testing must be both reasonable and medically necessary.

6

Urine screenings can be "qualitative" and used to determine the presence or absence of substances, or the screenings can be "quantitative" and used to provide a numerical concentration of a substance. Medicare limits the allowed purposes of quantitative screenings. One such accepted purpose would be if a patient tested negative for a prescribed medication during a qualitative screening, but the patient insisted s/he was taking the medication. A laboratory may then perform a quantitative screening to evaluate or confirm the findings of the qualitative testing. The same is true if a patient tested positive for a non-prescribed medication/drug during qualitative testing which s/he insisted had not been used. Regular, routine, or recreational drug screenings, however, are not reasonable or medically necessary. Further, the patient's medical record must include documentation that fully supports the reasonableness of and medical necessity for the urine drug testing.

18.     Under Medicare Part A and Part B, home health care services were required to be reasonable and medically necessary to the treatment of the patient's illness or injury. Reimbursement for home health care services required that a physician certified the need for services and established a Plan of Care. Home health care services that were not certified by a physician or were not provided as represented were not reasonable and necessary. Medicare Part B covered the costs of physicians' services, including physician home visits, physician certification and recertification of home health care services, and physician supervision of home

health care services.  Generally, Medicare Part B covered these costs only if, among other requirements, they were medically necessary, ordered by a physician, and not induced by the payment of remuneration.

19.    Medicare coverage for home health care services required that the following qualifying conditions, among others, be met: (a) the Medicare beneficiary is confined to the home; (b) the beneficiary needs skilled nursing services, physical therapy, or occupational therapy; (c) the beneficiary is under the care of a qualified physician who established a written Plan of Care for the beneficiary, signed by the physician and by a Registered Nurse ("RN"), or by a qualified physical therapist if only therapy services are required from the home health agency; (d) skilled nursing services or physical therapy services are provided by, or under the supervision of, a licensed RN or physical therapist in accordance with the Plan of Care; and (e) the services provided are medically necessary.

20.    To receive reimbursement for a covered service from Medicare, a provider must submit a claim, either electronically or using a form (*e.g.*, a CMS-1500 form or UB-92), containing the required information appropriately identifying the provider, patient, and services rendered, among other things.

### The Michigan Medicaid Program

21.    The Michigan Medicaid program ("Medicaid") was a federal and state funded program providing benefits to individuals and families who met specified

financial and other eligibility requirements, and certain other individuals who lacked adequate resources to pay for medical care. CMS was responsible for overseeing the Medicaid program in participating states, including Michigan. Individuals who received benefits under the Medicaid program were similarly referred to as "beneficiaries."

22. Medicaid was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

23. Medicaid covered the costs of medical services and products, including reimbursements to physicians for medical services. Generally, Medicaid covered these costs, if among other requirements, they were medically necessary and actually rendered.

24. To receive reimbursement from Medicaid, medical services providers submitted or caused the submission of claims to Medicaid for payment of services.

**The Patino Medical Practices**

25. Global Quality Inc. ("Global Quality") was a Michigan corporation doing business at 3800 Woodward Ave., Ste. 1100, Detroit, Michigan. Global Quality was enrolled as a participating provider with Medicare and Medicaid, and submitted claims to Medicare and Medicaid.

26. Renaissance Age Management Institute LLC ("RenAMI") (referred to collectively with Global Quality as the "Patino Medical Practices") was a Michigan

corporation doing business at 29150 Buckingham Street, Ste. 6, Livonia, Michigan. RenAMI was enrolled as a participating provider with Medicare and Medicaid, and submitted claims to Medicare and Medicaid.

### The Patino Diagnostic Laboratories

27.    FDRS Diagnostics, PLLC ("FDRS") was a Michigan corporation doing business at 29150 Buckingham Street, Ste. 6 #101, Livonia, Michigan. FDRS was enrolled as a participating provider with Medicare and Medicaid, and submitted claims to Medicare and Medicaid.

28.    Patino Laboratories, Inc. ("Patino Laboratories") (referred to, collectively with FDRS, as the "Patino Diagnostic Laboratories") was a Michigan corporation doing business at 29150 Buckingham Street, Ste. 8, Livonia, Michigan. Patino Laboratories was enrolled as a participating provider with Medicare and Medicaid, and submitted claims to Medicare and Medicaid.

### Defendants and Other Entities and Individuals

29.    Defendant **FRANCISCO PATINO**, a resident of Wayne County, is a practicing physician who was enrolled as a participating provider with Medicare and Medicaid, and submitted claims to Medicare and Medicaid. **FRANCISCO PATINO** controlled and operated Global Quality, RenAMI, FDRS, and Patino Laboratories. **FRANCISCO PATINO** was the sole owner of RenAMI and a part owner of FDRS and Patino Laboratories.

10

30.     Co-Owner-1 was an office manager of RenAMI and a co-owner of FDRS and Patino Laboratories.

31.     Business Partner-1 was a former business partner of **FRANCISCO PATINO**'s.

32.     Physician-1 was a practicing physician who previously practiced at RenAMI.

33.     Intermediary-1 was an individual who received illegal kickbacks and bribes on behalf of **FRANCISCO PATINO** in exchange for the ordering of urine drug testing and other diagnostic testing by **FRANCISCO PATINO**.

34.     Bookkeeper-1 was a bookkeeper who worked for **FRANCISCO PATINO**, the Patino Medical Providers, and the Patino Diagnostic Laboratories.

35.     MMA Management Company-1 was a management and marketing firm that represented a prominent team of Mixed Martial Arts ("MMA") fighters.

36.     Laboratory-1 was a laboratory that conducted urine drug testing. Laboratory-1 was enrolled as a participating provider with Medicare and submitted claims to Medicare.

37.     Laboratory-2 was a laboratory that conducted urine drug testing. Laboratory-2 was enrolled as a participating provider with Medicare and submitted claims to Medicare.

## COUNT 1
### (18 U.S.C. § 1349—Conspiracy to Commit Health Care Fraud)
### D-1 FRANCISCO PATINO

38.     Paragraphs 1 through 37 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

39.     From in or around December 2008, and continuing through in or around the Present, the exact dates being unknown to the Grand Jury, in Wayne County, the Eastern District of Michigan, and elsewhere, **FRANCISCO PATINO** and others did willfully and knowingly, combine, conspire, confederate, and agree with each other, and others known and unknown to the Grand Jury, to commit certain offenses against the United States, namely: to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare and Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

### Purpose of the Conspiracy

40.     It was a purpose of the conspiracy for **FRANCISCO PATINO** and

other co-conspirators to unlawfully enrich themselves by, among other things: (a) submitting or causing the submission of false and fraudulent claims to Medicare and Medicaid for claims based on kickbacks and bribes; (b) submitting or causing the submission of false and fraudulent claims to Medicare and Medicaid for services that were (i) medically unnecessary; (ii) not eligible for reimbursement; and/or (iii) not provided as represented; (c) concealing the submission of false and fraudulent claims to Medicare and Medicaid, and the receipt and transfer of the proceeds from the fraud; and (d) diverting proceeds of the fraud for the personal use and benefit of the defendant and his co-conspirators.

### Manner and Means

The manner and means by which the defendant and his co-conspirators sought to accomplish the purpose of the conspiracy included, among others, the following:

41.    **FRANCISCO PATINO** applied for and maintained various Medicare, Medicaid, and other provider numbers associated with **FRANCISCO PATINO** personally, the Patino Medical Practices, and Patino Diagnostic Laboratories.

42.    **FRANCISCO PATINO** falsely certified to Medicare that he personally, the Patino Medical Practices, and the Patino Diagnostic Laboratories would comply with all Medicare rules and regulations, and federal laws, including that they would not knowingly present or cause to be presented a false and fraudulent

claim for payment by Medicare and that they would refrain from violating the federal Stark Act and Anti-Kickback statute.

43.     **FRANCISCO PATINO** obtained access to thousands of patients by becoming the top prescriber of Oxycodone 30 mg in the State of Michigan from 2016-2017 and prescribing in excess of 2.2 million dosage units of controlled substances, including medically unnecessary prescriptions for Fentanyl, Oxycodone, Oxymorphone. Some of these medically unnecessary opioids and other drugs were resold on the street.

44.     **FRANCISCO PATINO** and others required beneficiaries to submit to expensive injections before prescribing opioids and other controlled substances, even though the injections were medically unnecessary, sometimes painful, not eligible for reimbursement, and not provided as represented.

45.     **FRANCISCO PATINO** conducted a battery of fraudulent, medically unnecessary, and excessive injections and other procedures in order to increase revenue for **FRANCISCO PATINO** and his co-conspirators.

46.     **FRANCISCO PATINO** and others solicited and received illegal kickbacks and bribes in exchange for the referral of patients or ordering of testing, including but not limited to for the ordering of urine drug testing from Laboratory-1, Laboratory-2, and the Patino Laboratories.

47.     **FRANCISCO PATINO** and others referred or caused the referral, and ordered or caused the ordering of the testing, as described in Paragraph 46, even though the referrals and testing were procured by the payment of kickbacks and bribes, medically unnecessary, not eligible for reimbursement, and not provided as represented.

48.     **FRANCISCO PATINO** concealed and disguised the kickbacks and bribes that he received from co-conspirators by entering into sham contracts or employment relationships, causing the illegal kickbacks and bribes to be transferred to Intermediary-1 and others for **FRANCISCO PATINO**'s benefit, and causing Intermediary-1 and others to make payments for **FRANCISCO PATINO**'s benefit, including payments of in excess of one hundred thousand dollars for **FRANCISCO PATINO**'s advertisement of the "Patino Diet" through his sponsorship of boxers, MMA fighters, and Ultimate Fighting Championship ("UFC") fighters, including world champions.

49.     **FRANCISCO PATINO** and others falsified, fabricated, altered, and caused the falsification, fabrication, and alteration of medical records, including patient files, treatment plans, diagnostic testing orders, and other records, all to support claims for office visits, injections, urine drug testing, diagnostic testing, nerve conduction studies, home health services, and other services that were

obtained through illegal kickbacks and bribes, medically unnecessary, not eligible for reimbursement, and/or not provided as represented.

50. Even after **FRANCISCO PATINO** and others were put on notice that 100% of a sample of injection claims that were reviewed by Medicare were not eligible for Medicare reimbursement, RenAMI was suspended by a Medicaid provider for **FRANCISCO PATINO**'s repeated administration of injections on patients, and **FRANCISCO PATINO** entered into a consent order with the State of Michigan that determined that his prescription of opioids "constitute[d] a violation of the public health code," **FRANCISCO PATINO** and his co-conspirators continued the unlawful practices described herein.

51. **FRANCISCO PATINO** and others facilitated and concealed the scheme, and obstructed investigations, by making false statements, or causing false statements to be made, and submitting or causing the submission of falsified documentation.

52. **FRANCISCO PATINO** and others submitted and caused the submission of false and fraudulent claims to Medicare and Medicaid in an amount in excess of approximately $112 million for services and testing that were obtained through illegal kickbacks and bribes, medically unnecessary, not eligible for reimbursement, and/or not provided as represented.

## COUNTS 2-3
### (18 U.S.C. §§ 1347 and 2 – Health Care Fraud)
### D-1 FRANCISCO PATINO

53.     Paragraphs 1 through 37 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.  On or about the dates enumerated below, in Wayne County, the Eastern District of Michigan, and elsewhere, **FRANCISCO PATINO**, in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare and Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of Medicare and Medicaid in connection with the delivery of and payment for health care benefits, items, and services.

### Purpose of the Scheme and Artifice

54.     It was the purpose of the scheme and artifice for **FRANCISCO PATINO** to unlawfully enrich himself and his accomplices by, among other things: (a) submitting or causing the submission of false and fraudulent claims to Medicare and Medicaid for claims based on kickbacks and bribes; (b) submitting or causing the submission of false and fraudulent claims to Medicare and Medicaid for services

17

that were (i) medically unnecessary; (ii) not eligible for reimbursement; and/or (iii) not provided as represented; (c) concealing the submission of false and fraudulent claims to Medicare and Medicaid, and the receipt and transfer of the proceeds from the fraud; and (d) diverting proceeds of the fraud for the personal use and benefit of the defendants and their accomplices.

<strong>The Scheme and Artifice</strong>

55.    Paragraphs 41 through 52 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

<strong>Acts in Execution of the Scheme and Artifice</strong>

56.    On or about the dates specified below, in Wayne County, the Eastern District of Michigan, and elsewhere, **FRANCISCO PATINO**, in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, the above-described scheme and artifice to defraud a health care benefit program affecting commerce, that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of said health care benefit program:

| Count Defendant | Medicare Beneficiary | Approximate Date of Service | Description of Items Billed | Approximate Amount Billed to Medicare |
|---|---|---|---|---|
| 2 PATINO | G.M. | 12/10/2014 | Office Visit and Facet Joint Injections | $5,510.00 |
| 3 PATINO | C.B. | 1/28/2015 | Office Visit and Facet Joint Injections | $5,510.00 |

In violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT 4
### (18 U.S.C. § 371—Conspiracy to Defraud the United States and Pay and Receive Health Care Kickbacks)
### D-1 FRANCISCO PATINO

57.     Paragraphs 1 through 37 of the General Allegations section and Paragraphs 41 to 52 of the Manner and Means section of Count 1 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

58.     From in or around December 2008, and continuing through in or around the Present, the exact dates being unknown to the Grand Jury, in Wayne County, the Eastern District of Michigan, and elsewhere, **FRANCISCO PATINO** and others did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with each other, and others known and unknown to the Grand Jury:

19

a.      to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of the Medicare and Medicaid programs, in violation of Title 18, United States Code, Section 371, and to commit certain offenses against the United States, that is;

b.      to violate Title 42, United States Code, Section 1320a-7b(b)(2)(A)-(B), by knowingly and willfully offering and paying remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind to any person to induce such person: (i) to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare, and Medicaid; or (ii) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, that is, Medicare and Medicaid; and

c.      to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A)-(B), by knowingly and willfully soliciting and receiving remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind: (i) in return for referring an individual to a person for the furnishing and

arranging for the furnishing of an item and service for which payment may be made in whole and in part under a federal health care program, that is, Medicare and Medicaid; or (ii) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, that is, Medicare and Medicaid.

### Purpose of the Conspiracy

59.     It was a purpose of the conspiracy for **FRANCISCO PATINO** and his co-conspirators to unlawfully enrich themselves by:  (1) offering, paying, soliciting, and receiving kickbacks and bribes; and (2) submitting and causing the submission of claims to Medicare and Medicaid for medical items, testing, and services.

### Manner and Means

The manner and means by which the defendant and his co-conspirators sought to accomplish the purpose of the conspiracy included, among others, the following:

60.     Paragraphs 41 to 52 of the Manner and Means section of Count 1 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

### Overt Acts

In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one of the co-conspirators committed and caused to be committed in Wayne

County, the Eastern District of Michigan, and elsewhere, at least one of the following overt acts, among others:

61.    On or about May 24, 2012, **FRANCISCO PATINO** and others received an email from an associate of Laboratory-1 regarding the per-sample payment that **FRANCISCO PATINO** and others would receive for each urine drug sample that **FRANCISCO PATINO** and others obtained and ordered to be tested by Laboratory-1.

62.    On or about October 7, 2013, **FRANCISCO PATINO** and others received an email from Business Partner-1, which stated that "about $69,500 was paid direct deposit from my ADP payroll to [**FRANCISCO PATINO**] for diagnostic just this year alone." The email attached a spreadsheet identifying payments to **FRANCISCO PATINO**.

63.    On or about October 15, 2013, **FRANCISCO PATINO** and others caused a wire transfer of $24,097.50 to be transmitted by an associate of Laboratory-1 and deposited into a bank account belonging to Intermediary-1 and ending in x6770, for the benefit of **FRANCISCO PATINO** and Intermediary-1.

64.    On or about October 16, 2013, **FRANCISCO PATINO** funded his advertisement of the "Patino Diet" by sponsoring boxers, MMA fighters, and UFC fighters with kickbacks and bribes that he received from co-conspirators.

65.    On or about October 16, 2013, **FRANCISCO PATINO** caused a wire

transfer from a bank account belonging to Intermediary-1 and ending in x8982, in the approximate amount of $1,000, to be deposited into a bank account belonging to MMA Management Company-1 and ending in x0248, for the benefit of **FRANCISCO PATINO** and to fund his sponsorship of a prominent team of MMA fighters as "brand ambassadors" for the Patino Diet.

66.    Although **FRANCISCO PATINO** had certified that he, the Patino Medical Practices, and the Patino Diagnostic Laboratories, would refrain from violating the federal Stark Act and Anti-Kickback statute, on or about June 26, 2016, **FRANCISCO PATINO** sent an email to Bookkeeper 1, stating that he intended to increase the "patient volume" at RenAMI from "254 patients in January" to "500-600 patients by the end of the Summer" as "[t]his should increase revenue for all entities."

67.    **FRANCISCO PATINO** and others disguised, or attempted to disguise, the nature, source, and beneficiary of these illegal kickbacks and bribes, as follows:

a.    On or about September 10, 2017, **FRANCISCO PATINO** sent an email to Co-Owner 1 and Bookkeeper 1, stating that his referral relationship with FDRS constituted a "violation of the Stark and Anti-Kickback laws" and that retroactively amending FDRS's tax returns to reflect a different ownership structure was necessary to "hopefully keep [Co-Owner-1] & I out of Federal Prison & having

23

all our assets seized to pay a 15 million dollar fine."

b.      Although RenAMI submitted or caused the submission of in excess of approximately $70 million in claims to Medicare alone, on or about July 21, 2017, **FRANCISCO PATINO** sent a text message to Physician-1, stating that he "must divest myself 100% from RenAMI before I can fully ramp up lab" and that his preference was to "[s]ell the practice to [Physician-1] for $1 dollar."

All in violation of Title 18, United States Code, Section 371 and Title 18, United States Code, Section 2.

## COUNT 5
### (42 U.S.C. § 1320a-7b(b)(1)(A)) – Receipt of Kickbacks in Connection with a Federal Health Care Program)
### D-1 FRANCISCO PATINO

68.      Paragraphs 1 through 37 of the General Allegations section and Paragraphs 41 to 52 of the Manner and Means section of Count 1 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

69.      On or about the date set forth below, in Wayne County, the Eastern District of Michigan, and elsewhere, **FRANCISCO PATINO** did knowingly and willfully solicit and receive remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check, as set forth below, (A) in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a federal health care program, that is, Medicare, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, that is, Medicare, as set forth below:

| Count Defendant | Approximate Date of Payment | Description | Approximate Amount |
|---|---|---|---|
| 5 PATINO | October 16, 2013 | Transfer from Intermediary-1 to MMA Management | $1,000 |

In violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A)-(B) and Title 18, United States Code, Section 2.

## FORFEITURE ALLEGATIONS
### (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461; 18 U.S.C. §§982(a)(1) and (7) – Criminal Forfeiture)

70.    The allegations contained in Count 1-5 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture against defendant **FRANCISCO PATINO** pursuant to Title 18, United States Code, Sections 981 and 982, and Title 28, United States Code, Section 2461.

71.    Pursuant to Title 18, United States Code, Section 981(a)(1)(C), together with Title 28, United States Code, Section 2461, upon being convicted of the crime charged in Count 1 of this Indictment, the convicted defendant shall forfeit to the

United States any property, real or personal, which constitutes or is derived from proceeds traceable to the commission of the offense.

72. Pursuant to Title 18, United States Code, Section 982(a)(7), upon being convicted of the crimes charged in Counts 1 through 5 of this Indictment, the convicted defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

73. Money Judgment: Property subject to forfeiture includes, but is not limited to a forfeiture money judgment equal to: at least $112,000,000 in United States currency, in the aggregate, or such amount as is proved in this matter, representing the total amount of proceeds and/or gross proceeds obtained as a result of each defendant's violations as alleged in Counts 1-5 of this Indictment.

74. Substitute Assets: If the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property that cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) as incorporated by Title 18, United States Code, Section 982(b) and/or Title 28, United States Code, Section 2461, to seek to forfeit any other property of **FRANCISCO PATINO** up to the value of such property.

THIS IS A TRUE BILL.

s/GRAND JURY FOREPERSON
Grand Jury Foreperson

MATTHEW SCHNEIDER
United States Attorney

s/WAYNE F. PRATT
WAYNE F. PRATT
Chief, Health Care Fraud Unit
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-2548
wayne.pratt@usdoi.gov

s/ALLAN MEDINA
ALLAN MEDINA
Assistant Chief
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Avenue, N.W.
Washington, D.C. 20005
(202) 257-6537
allan.medina@usdoj.gov

s/JACOB FOSTER
JACOB FOSTER
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Avenue, N.W.
Washington, D.C. 20005
(202) 305-3520
jacob.foster@usdoj.gov

Date: June 26, 2018

# ORIGINAL

| United States District Court<br>Eastern District of Michigan | Criminal Case Co | Case:2:18-cr-20451<br>Judge: Roberts, Victoria A.<br>MJ: Grand, David R.<br>Filed: 06-26-2018 At 01:18 PM<br>SEALED MATTER (dat) |
|---|---|---|

NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to com

| **Companion Case Information** | **Companion Case Number:** 17-cr-20465 |
|---|---|
| This may be a companion case based upon LCrR 57.10 (b)(4)[1]: | **Judge Assigned:** Hon. Denise Page Hood |
| ☒ Yes          ☐ No | **AUSA's Initials:** J N F |

**Case Title:** USA v.  Francisco Patino

**County where offense occurred :**  Wayne County

**Check One:**     ☒ Felony                  ☐ Misdemeanor              ☐ Petty

✓ Indictment/____Information — **no prior complaint.**

____Indictment/____Information — based upon prior complaint [*Case number:*                    ]

____Indictment/____Information — based upon **LCrR 57.10 (d)** [*Complete Superseding section below*].

## Superseding Case Information

**Superseding to Case No:** _____     **Judge:** _____

☐ Corrects errors; no additional charges or defendants.
☐ Involves, for plea purposes, different charges or adds counts.
☐ Embraces same subject matter but adds the additional defendants or charges below:

| **Defendant name** | **Charges** | **Prior Complaint (if applicable)** |
|---|---|---|

**Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.**

June 26, 2018
_____
Date

Jacob Foster,Trial Attorney
211 West Fort Street, Detroit, MI 48226
Phone: (202) 615 -6521
Fax:     (313) 226 - 0816
E-Mail address: Jacob.Foster@usdoj.gov
Attorney Bar #: CA 250785

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, or (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.

5/16