UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA

Case No: 18-cr-20451

v.

Hon. Denise Page Hood

D-1 FRANCISCO PATINO

VIO: 18 U.S.C. § 1349
18 U.S.C. § 1347
18 U.S.C. § 371
42 U.S.C. § 1320a-
7b(b)(1)(A)-(B)
18 U.S.C. § 1956
18 U.S.C. § 2

Defendant.

_____/

## SUPERSEDING INDICTMENT

THE GRAND JURY CHARGES:

### General Allegations

At all times relevant to this Superseding Indictment:

### The Medicare Program

1.     The Medicare program was a federal health care program providing benefits to persons who were over the age of 65 or disabled.   Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

2.      Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

3.      Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D).

4.      Specifically, Part A of the Medicare program covered inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation.

5.      Part B of the Medicare program covered the cost of physicians' services, medical equipment and supplies, and diagnostic laboratory services. Specifically, Part B covered medically necessary physician office services, outpatient physical therapy services, nerve conduction testing, ultrasounds, and nerve block injections, including facet joint injections. Part B also covered services that were provided in connection with a laboratory testing facility, including urine drug testing.

6.      National Government Services ("NGS") administered the Medicare Part A program for claims arising in the State of Michigan. Wisconsin Physicians Service ("WPS") administered the Medicare Part B program for claims arising in the State of Michigan. CMS contracted with NGS to receive, adjudicate, process, and pay Part A claims. CMS contracted with WPS to receive, adjudicate, process, and pay Part B claims, including medical services related to physician office services, outpatient physical therapy services, and nerve block injections, including facet joint

2

injections, as well as services that were provided in connection with a laboratory testing facility, including urine drug testing.

7. TrustSolutions LLC was the Program Safeguard Contractor for Medicare Part A and Part B in the State of Michigan until April 24, 2012, when it was replaced by Cahaba Safeguard Administrators LLC as the Zone Program Integrity Contractor ("ZPIC"). Cahaba was replaced by AdvancedMed in May 2015.

8. The Program Safeguard Contractor or ZPIC is a contractor that investigates fraud, waste, and abuse. As part of an investigation, the Program Safeguard Contractor or ZPIC may conduct a clinical review of medical records to ensure that payment is made only for services that meet all Medicare coverage and medical necessity requirements.

9. Payments under the Medicare program were often made directly to a provider of the goods or services, rather than to a Medicare beneficiary. This payment occurred when the provider submitted the claim to Medicare for payment, either directly or through a billing company.

10. Upon certification, the medical provider, whether a clinic, physician, or other health care provider that provided services to Medicare beneficiaries, was able to apply for a Medicare Provider Identification Number ("PIN") for billing purposes. In its enrollment application, a provider was required to disclose to Medicare any

person or company who held an ownership interest of 5% or more or who had managing control of the provider. A health care provider who was assigned a Medicare PIN and provided services to beneficiaries was able to submit claims for reimbursement to the Medicare contractor/carrier that included the PIN assigned to that medical provider.

11.     A Medicare claim was required to set forth, among other things, the beneficiary's name, the date the services were provided, the cost of the services, and the name and identification number of the physician or other health care provider who had ordered the services. When an individual medical provider was associated with a clinic and medically necessary services were provided at that clinic's location, Medicare Part B required that the individual provider numbers associated with the clinic and rendering provider be placed on the claim submitted to the Medicare contractor.

12.     By becoming a participating provider in Medicare, enrolled providers agreed to abide by the policies and procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, were required to abide by all provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules, and regulations issued by CMS and its authorized agents and contractors. Health care providers were given and provided

4

with online access to Medicare manuals and services bulletins describing proper billing procedures and billing rules and regulations.

13.     Health care providers could only submit claims to Medicare for reasonable and medically necessary services that they rendered.  Medicare would not pay claims procured through kickbacks and bribes.

14.     Medicare regulations required health care providers enrolled with Medicare to maintain complete and accurate patient medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the physician.  Medicare requires complete and accurate patient medical records so that Medicare may verify that the services were provided as described on the claim form.  These records were required to be sufficient to permit Medicare, through WPS and other contractors, to review the appropriateness of Medicare payments made to the health care provider.

15.     Under Medicare Part B, physician office visit services, outpatient physical therapy services, nerve conduction, and nerve block injections, including facet joint injections, were required to be reasonable and medically necessary for the treatment or diagnosis of the patient's illness or injury.  Individuals providing these services were required to have the appropriate training, qualifications, and licenses to provide such services.  Providers were required to:  (1) document the medical

necessity of these services; (2) document the date the service was performed; (3) identify the provider who performed the service; and (4) identify the clinic, physician office, or group practice where the provider provided the service. Providers conveyed this information to Medicare by submitting claims using billing codes and modifiers. To be reimbursed from Medicare for physician office visit services, outpatient physical therapy services, nerve conduction, and nerve block injections, including facet joint injections, the services had to be reasonable, medically necessary, documented, and actually provided as represented to Medicare.

16. Under Medicare Part B, for a laboratory to properly bill and be paid by Medicare for laboratory testing, including urine drug testing, the patient must, among other things, qualify for the testing, including urine drug testing, under Medicare's established rules and regulations. The testing also must be rendered according to Medicare's rules and regulations, and certain documents must be completed before a claim is submitted for reimbursement to Medicare.

17. For a laboratory to properly bill and be paid by Medicare for urine drug testing, the urine drug testing must be both reasonable and medically necessary. Urine screenings can be "qualitative" and used to determine the presence or absence of substances, or the screenings can be "quantitative" and used to provide a numerical concentration of a substance. Medicare limits the allowed purposes of quantitative screenings. One such accepted purpose would be if a patient tested

negative for a prescribed medication during a qualitative screening, but the patient insisted s/he was taking the medication. A laboratory may then perform a quantitative screening to evaluate or confirm the findings of the qualitative testing. The same is true if a patient tested positive for a non-prescribed medication/drug during qualitative testing which s/he insisted had not been used. Regular, routine, or recreational drug screenings, however, are not reasonable or medically necessary. Further, the patient's medical record must include documentation that fully supports the reasonableness of and medical necessity for the urine drug testing.

18. Under Medicare Part A and Part B, home health care services were required to be reasonable and medically necessary to the treatment of the patient's illness or injury. Reimbursement for home health care services required that a physician certified the need for services and established a Plan of Care. Home health care services that were not certified by a physician or were not provided as represented were not reasonable and necessary. Medicare Part B covered the costs of physicians' services, including physician home visits, physician certification and recertification of home health care services, and physician supervision of home health care services. Generally, Medicare Part B covered these costs only if, among other requirements, they were medically necessary, ordered by a physician, and not induced by the payment of remuneration.

19.     Medicare coverage for home health care services required that the following qualifying conditions, among others, be met: (a) the Medicare beneficiary is confined to the home; (b) the beneficiary needs skilled nursing services, physical therapy, or occupational therapy; (c) the beneficiary is under the care of a qualified physician who established a written Plan of Care for the beneficiary, signed by the physician and by a Registered Nurse ("RN"), or by a qualified physical therapist if only therapy services are required from the home health agency; (d) skilled nursing services or physical therapy services are provided by, or under the supervision of, a licensed RN or physical therapist in accordance with the Plan of Care; and (e) the services provided are medically necessary.

20.     To receive reimbursement for a covered service from Medicare, a provider must submit a claim, either electronically or using a form (*e.g.*, a CMS-1500 form or UB-92), containing the required information appropriately identifying the provider, patient, and services rendered, among other things.

### The Michigan Medicaid Program

21.     The Michigan Medicaid program ("Medicaid") was a federal and state funded program providing benefits to individuals and families who met specified financial and other eligibility requirements, and certain other individuals who lacked adequate resources to pay for medical care.  CMS was responsible for overseeing the Medicaid program in participating states, including Michigan.  Individuals who

received benefits under the Medicaid program were similarly referred to as "beneficiaries."

22.     Medicaid was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

23.     Medicaid covered the costs of medical services and products, including reimbursements to physicians for medical services. Generally, Medicaid covered these costs, if among other requirements, they were medically necessary and actually rendered.

24.     To receive reimbursement from Medicaid, medical services providers submitted or caused the submission of claims to Medicaid for payment of services.

### The Patino Medical Practices

25.     Global Quality Inc. ("Global Quality") was a Michigan corporation doing business at 3800 Woodward Ave., Ste. 1100, Detroit, Michigan. Global Quality was enrolled as a participating provider with Medicare and Medicaid, and submitted claims to Medicare and Medicaid.

26.     Renaissance Age Management Institute LLC ("RenAMI") (referred to collectively with Global Quality as the "Patino Medical Practices") was a Michigan corporation doing business at 29150 Buckingham Street, Ste. 6, Livonia, Michigan. RenAMI was enrolled as a participating provider with Medicare and Medicaid, and submitted claims to Medicare and Medicaid.

9

## The Patino Diagnostic Laboratories

27. FDRS Diagnostics, PLLC ("FDRS") was a Michigan corporation doing business at 29150 Buckingham Street, Ste. 6 #101, Livonia, Michigan. FDRS was enrolled as a participating provider with Medicare and Medicaid, and submitted claims to Medicare and Medicaid.

28. Patino Laboratories, Inc. ("Patino Laboratories") (referred to, collectively with FDRS, as the "Patino Diagnostic Laboratories") was a Michigan corporation doing business at 29150 Buckingham Street, Ste. 8, Livonia, Michigan. Patino Laboratories was enrolled as a participating provider with Medicare and Medicaid, and submitted claims to Medicare and Medicaid.

## Defendants and Other Entities and Individuals

29. Defendant **FRANCISCO PATINO**, a resident of Wayne County, is a practicing physician who was enrolled as a participating provider with Medicare and Medicaid, and submitted claims to Medicare and Medicaid. **FRANCISCO PATINO** controlled and operated Global Quality, RenAMI, FDRS, and Patino Laboratories. **FRANCISCO PATINO** was the sole owner of RenAMI and a part owner of FDRS and Patino Laboratories.

30. Co-Owner-1 was an office manager of RenAMI and a co-owner of FDRS and Patino Laboratories.

10

31.     Mashiyat Rashid was a former business partner of **FRANCISCO PATINO**'s.

32.     Physician-1 was a practicing physician who previously practiced at RenAMI.

33.     Joshua Burns was an individual who received illegal kickbacks and bribes on behalf of **FRANCISCO PATINO** in exchange for the ordering of urine drug testing and other diagnostic testing by **FRANCISCO PATINO**.

34.     Bookkeeper-1 was a bookkeeper who worked for **FRANCISCO PATINO**, the Patino Medical Providers, and the Patino Diagnostic Laboratories.

35.     Fighter-1 was a fighter involved in Triple-X cagefighting.

36.     Fighter-2 was a UFC Champion and UFC Hall of Fame member.

37.     Fighter-3 was a Michigan boxer.

38.     MMA Management Company-1 was a management and marketing firm that represented a prominent team of MMA fighters.

39.     Laboratory-1 was a laboratory that conducted urine drug testing. Laboratory-1 was enrolled as a participating provider with Medicare and submitted claims to Medicare.

40.     Laboratory-2 was a laboratory that conducted urine drug testing. Laboratory-2 was enrolled as a participating provider with Medicare and submitted claims to Medicare.

## COUNT 1
### (18 U.S.C. § 1349—Conspiracy to Commit Health Care Fraud and Wire Fraud)
### D-1 FRANCISCO PATINO

41.     Paragraphs 1 through 40 of the General Allegations section of this Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

42.     From in or around December 2008, and continuing through in or around July 2018, the exact dates being unknown to the Grand Jury, in Wayne County, the Eastern District of Michigan, and elsewhere, **FRANCISCO PATINO** and others did willfully and knowingly, combine, conspire, confederate, and agree with each other, and others known and unknown to the Grand Jury, to commit certain offenses against the United States, namely:

a.     to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare and Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347; and

b.     to knowingly and with the intent to defraud devise and intend to devise a scheme and artifice to defraud, and for obtaining money and property by means of

12

materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

### Purpose of the Conspiracy

43.     It was a purpose of the conspiracy for **FRANCISCO PATINO** and other co-conspirators to unlawfully enrich themselves by, among other things: (a) submitting or causing the submission of false and fraudulent claims to Medicare and Medicaid for claims based on kickbacks and bribes; (b) submitting or causing the submission of false and fraudulent claims to Medicare and Medicaid for services that were (i) medically unnecessary; (ii) not eligible for reimbursement; and/or (iii) not provided as represented; (c) concealing the submission of false and fraudulent claims to Medicare and Medicaid, and the receipt and transfer of the proceeds from the fraud; and (d) diverting proceeds of the fraud for the personal use and benefit of the defendant and his co-conspirators.

### Manner and Means

The manner and means by which the defendant and his co-conspirators sought to accomplish the purpose of the conspiracy included, among others, the following:

44.     **FRANCISCO PATINO** would apply for and maintain various Medicare, Medicaid, BlueCross BlueShield, and other provider numbers associated with **FRANCISCO PATINO** personally, the Patino Medical Practices, and Patino Diagnostic Laboratories.

45.     **FRANCISCO PATINO** would falsely certify to Medicare that he personally, the Patino Medical Practices, and the Patino Diagnostic Laboratories would comply with all Medicare rules and regulations, and federal laws, including that they would not knowingly present or cause to be presented a false and fraudulent claim for payment by Medicare and that they would refrain from violating the federal Stark Act and Anti-Kickback statute.

46.     **FRANCISCO PATINO** would obtain access to thousands of patients by becoming the top prescriber of Oxycodone 30 mg in the State of Michigan from 2016-2017 and prescribing in excess of 2.2 million dosage units of controlled substances, including medically unnecessary prescriptions for Fentanyl, Oxycodone, Oxymorphone.  Fentanyl is one of the most potent opioids available for human use. Some of these medically unnecessary opioids and other drugs were resold on the street.

47.     **FRANCISCO PATINO** and others would require vulnerable patients including those addicted to opioids, to submit to expensive injections before prescribing opioids and other controlled substances, even though the injections were medically unnecessary, sometimes painful, not eligible for reimbursement, and not provided as represented.

48.     **FRANCISCO PATINO** would conduct a battery of fraudulent, unnecessary, and excessive injections and other procedures in order to increase revenue for **FRANCISCO PATINO** and his co-conspirators.

49.     **FRANCISCO PATINO** and others would solicit and receive illegal kickbacks and bribes in exchange for the referral of patients or ordering of testing, including for the ordering of urine drug testing from Laboratory-1, Laboratory-2, and the Patino Laboratories.

50.     **FRANCISCO PATINO** and others would make the referrals, or order the testing, described in Paragraph 49, even though the referrals and testing were procured by the payment of kickbacks and bribes, medically unnecessary, not eligible for reimbursement, and not provided as represented.

51.     **FRANCISCO PATINO** and others would disguise the nature, source, and beneficiary of these kickbacks and bribes by entering into sham contracts or employment relationships, causing the illegal kickbacks and bribes to be paid to Intermediary-1 and others on **FRANCISCO PATINO**'s behalf, and causing

Intermediary-1 and others to use the kickbacks and bribes that they received on behalf of **FRANCISCO PATINO** to pay costs incurred by **FRANCISCO PATINO**, including for tens of thousands of dollars in costs related to **FRANCISCO PATINO**'s advertisement of the "Patino Diet" through his sponsorship of boxers, Mixed Martial Arts ("MMA") fighters, and Ultimate Fighting Championship ("UFC") fighters, including world champions.

52.     **FRANCISCO PATINO** and others, falsified, fabricated, altered, and caused the falsification, fabrication, and alteration of medical records, including patient files, treatment plans, diagnostic testing orders, and other records, all to support claims for office visits, injections, urine drug testing, diagnostic testing, nerve conduction studies, home health services, and other services that were obtained through illegal kickbacks and bribes, medically unnecessary, not eligible for reimbursement, and/or not provided as represented.

53.     Even after **FRANCISCO PATINO** and others were put on notice that 100% of a sample of injection claims that were reviewed by Medicare were not eligible for Medicare reimbursement, RenAMI was suspended by a Medicaid provider for **FRANCISCO PATINO**'s repeated administration of injections on patients, and **FRANCISCO PATINO** entered into a consent order with the State of Michigan that determined that his prescription of opioids "constitute[d] a violation

of the public health code," **FRANCISCO PATINO** and his co-conspirators continued the unlawful practices described herein.

54.     **FRANCISCO PATINO** and others facilitated and concealed the scheme, and obstructed investigations, by making false statements, or causing false statements to be made, and submitting or causing the submission of falsified documentation.

55.     **FRANCISCO PATINO** and others submitted and caused the submission of false and fraudulent claims to Medicare and Medicaid in an amount in excess of approximately $120 million for services and testing that were obtained through illegal kickbacks and bribes, medically unnecessary, not eligible for reimbursement, and/or not provided as represented.

**COUNTS 2-3**
**(18 U.S.C. §§ 1347 and 2 – Health Care Fraud)**
**D-1 FRANCISCO PATINO**

56.     Paragraphs 1 through 40 of the General Allegations section of this Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.  From in or around December 2008 to in or around July 2018, in Wayne County, the Eastern District of Michigan, and elsewhere, **FRANCISCO PATINO**, in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as

17

defined in Title 18, United States Code, Section 24(b), that is, Medicare and Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of Medicare and Medicaid in connection with the delivery of and payment for health care benefits, items, and services.

### Purpose of the Scheme and Artifice

57.    It was the purpose of the scheme and artifice for **FRANCISCO PATINO** to unlawfully enrich himself and his accomplices by, among other things: (a) submitting or causing the submission of false and fraudulent claims to Medicare and Medicaid for claims based on kickbacks and bribes; (b) submitting or causing the submission of false and fraudulent claims to Medicare and Medicaid for services that were (i) medically unnecessary; (ii) not eligible for reimbursement; and/or (iii) not provided as represented; (c) concealing the submission of false and fraudulent claims to Medicare and Medicaid, and the receipt and transfer of the proceeds from the fraud; and (d) diverting proceeds of the fraud for the personal use and benefit of the defendants and their accomplices.

### The Scheme and Artifice

58.    Paragraphs 44 through 55 of this Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

**Acts in Execution of the Scheme and Artifice**

59.     On or about the dates specified below, in Wayne County, the Eastern District of Michigan, and elsewhere, **FRANCISCO PATINO**, in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, the above-described scheme and artifice to defraud a health care benefit program affecting commerce, that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of said health care benefit program:

| Count Defendant(s) | Medicare Beneficiary | Approximate Date of Service | Description of Items Billed | Approximate Amount Billed to Medicare |
|---|---|---|---|---|
| 2 PATINO | G.M. | 12/10/2014 | Office Visit and Facet Joint Injections | $5,510.00 |
| 3 PATINO | C.B. | 1/28/2015 | Office Visit and Facet Joint Injections | $5,510.00 |

In violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT 4
**(18 U.S.C. § 371—Conspiracy to Defraud the United States and Pay and Receive Health Care Kickbacks)**
**D-1 FRANCISCO PATINO**

60.     Paragraphs 1 through 40 of the General Allegations section and

Paragraphs 44 to 55 of the Manner and Means section of Count 1 of this Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

61.    From in or around December 2008, and continuing through in or around July 2018, the exact dates being unknown to the Grand Jury, in Wayne County, the Eastern District of Michigan, and elsewhere, **FRANCISCO PATINO** and others did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with each other, and others known and unknown to the Grand Jury:

a.    to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of the Medicare and Medicaid programs, in violation of Title 18, United States Code, Section 371, and to commit certain offenses against the United States, that is;

b.    to violate Title 42, United States Code, Section 1320a-7b(b)(2)(A)-(B), by knowingly and willfully offering and paying remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind to any person to induce such person: (i) to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be

made in whole and in part under a Federal health care program, that is, Medicare, and Medicaid; or (ii) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, that is, Medicare and Medicaid; and

  c.  to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A)-(B), by knowingly and willfully soliciting and receiving remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind: (i) in return for referring an individual to a person for the furnishing and arranging for the furnishing of an item and service for which payment may be made in whole and in part under a federal health care program, that is, Medicare and Medicaid; or (ii) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, that is, Medicare and Medicaid.

### Purpose of the Conspiracy

  62.  It was a purpose of the conspiracy for **FRANCISCO PATINO** and his co-conspirators to unlawfully enrich themselves by: (1) offering, paying, soliciting, and receiving kickbacks and bribes; and (2) submitting and causing the submission of claims to Medicare and Medicaid for medical items, testing, and services.

**Manner and Means**

The manner and means by which the defendant and his co-conspirators sought to accomplish the purpose of the conspiracy included, among others, the following:

63.     Paragraphs 44 to 55 of the Manner and Means section of Count 1 of this Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

**Overt Acts**

In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one of the co-conspirators committed and caused to be committed in Wayne County, the Eastern District of Michigan, and elsewhere, at least one of the following overt acts, among others:

64.     On or about May 24, 2012, **FRANCISCO PATINO** and others received an email from a representative of Laboratory-1, memorializing an agreement that **FRANCISCO PATINO** and others would be paid on a per-sample basis for each urine drug sample that **FRANCISCO PATINO** and others obtained and ordered to be tested by Laboratory-1.

65.     On or about October 7, 2013, **FRANCISCO PATINO** and others received an email from Mashiyat Rashid, stating that "about $69,500 was paid direct deposit from my ADP payroll to [**FRANCISCO PATINO**] for diagnostic just this year alone." The email attached a spreadsheet identifying monthly payments to

**FRANCISCO PATINO**.

66. On or about October 15, 2013, **FRANCISCO PATINO** and others caused a representative of Laboratory-1 to transmit illegal kickbacks and bribes by interstate wire in the approximate amount of $24,097.50 to be deposited into a bank account belonging to Joshua Burns and ending in x6770, and Joshua Burns to transfer the approximate amount of $20,000 from a bank account belonging to Joshua Burns and ending in x6770 to a bank account belonging to Joshua Burns and ending in x8982.

67. On or about October 16, 2013, **FRANCISCO PATINO** caused Joshua Burns to use the proceeds of the illegal kickback scheme to pay or cause the payment of costs related to **FRANCISCO PATINO**'s advertisement of the "Patino Diet" through his sponsorship of boxers, Mixed Martial Arts ("MMA") fighters, and Ultimate Fighting Championship ("UFC") fighters, including but not limited to the following:

a. An electronic wire transfer in the approximate amount of $4,000 from a bank account belonging to Joshua Burns and ending in x8982 to a bank account belonging to Fighter-1 and ending in x0024, in connection with **FRANCISCO PATINO**'s sponsorship of a Triple-X Cagefighter;

b. An electronic wire transfer in the approximate amount of $3,000 from a bank account belonging to Joshua Burns and ending in x8982 to a bank

account belonging to Fighter-2 and ending in x0037, in connection with **FRANCISCO PATINO**'s sponsorship of a UFC Champion and UFC Hall of Fame member;

      c.    An electronic wire transfer in the approximate amount of $1,500 from a bank account belonging to Joshua Burns and ending in x8982 to a bank account belonging to Fighter-3 and ending in x0024, in connection with **FRANCISCO PATINO**'s sponsorship of a Michigan boxer;

      d.    An electronic wire transfer in the approximate amount of $1,000 from a bank account belonging to Joshua Burns and ending in x8982 to a bank account belonging to MMA Management Company-1 and ending in x0248, in connection with **FRANCISCO PATINO**'s sponsorship of a prominent team of MMA fighters as "brand ambassadors" for the Patino Diet.

      e.    Although **FRANCISCO PATINO** had certified that he, the Patino Medical Practices, and the Patino Diagnostic Laboratories, would refrain from violating the federal Stark Act and Anti-Kickback statute, on or about June 26, 2016, **FRANCISCO PATINO** would send an email to Bookkeeper 1, stating that he intended to increase the "patient volume" at RenAMI from "254 patients in January" to "500-600 patients by the end of the Summer" as "[t]his should increase revenue for all entities," including the Patino Diagnostic Laboratories from which **FRANCISCO PATINO** received illegal renumeration as a result of his diagnostic

referrals and ordering of urine drug testing.

68.    **FRANCISCO PATINO** and others would disguise, or attempt to disguise, the nature, source, and beneficiary of these illegal kickbacks and bribes, including through the following acts:

a.    On or about September 10, 2017, **FRANCISCO PATINO** sent an email to Co-Owner 1 and Bookkeeper 1, stating that his sole ownership of RenAMI and ownership of FDRS with others constituted a "violation of the Stark and Anti-Kickback laws" and that changing the ownership structure and retroactively amending FDRS's tax returns was necessary to "hopefully keep [Co-Owner-1] & I out of Federal Prison & having all our assets seized to pay a 15 million dollar fine."

b.    Although RenAMI has submitted or caused the submission of in excess of approximately $70 million to Medicare alone, on or about July 21, 2017, **FRANCISCO PATINO** would send a text message to Physician-1, stating that he "must divest myself 100% from RenAMI before I can fully ramp up lab" and that his preference was to "[s]ell the practice to [Physician-1] for $1 dollar."

All in violation of Title 18, United States Code, Section 371 and Title 18, United States Code, Section 2.

## COUNT 5
### (18 U.S.C. § 1956(h) – Conspiracy to Commit Money Laundering)
### D-1 FRANCISCO PATINO

69.     Paragraphs 1 through 40 of the General Allegations section and Paragraphs 44 to 55 of the Manner and Means section of Count 1 of this Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

70.     From in or around 2008 to in or around July 2018, in Wayne County, the Eastern District of Michigan, and elsewhere, **FRANCISCO PATINO** and others did knowingly and willfully combine, conspire, confederate, and agree with others, known and unknown to the Grand Jury, to commit certain offenses against the United States in violation of Title 18, United States Code, Sections 1956 and 1957, to wit:

a.      to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of specified unlawful activity, that is health care fraud and conspiracy to commit health care fraud, and a conspiracy to defraud the United States, with the intent to promote the carrying on of specified unlawful activity, that is health care fraud and conspiracy to commit health care fraud, and a conspiracy to defraud the United States, and that while conducting and attempting to conduct such financial transactions knew that the property involved in the financial transactions represented the proceeds of some

26

form of unlawful activity in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i);

b.      to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved proceeds of specified unlawful activity, that is health care fraud and conspiracy to commit health care fraud, and a conspiracy to defraud the United States, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

c.      to knowingly engage and attempt to engage in monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is health care fraud and conspiracy to commit health care fraud, and a conspiracy to defraud the United States, in violation of Title 18, United States Code, Section 1957.

## Manner and Means

The manner and means by which the defendant and his co-conspirators sought to accomplish the purpose of the conspiracy included, among others, the following:

71.    **FRANCISCO PATINO** would cause Medicare and Medicaid to remit payment of the proceeds of the defendant's health care fraud and illegal kickback scheme into various corporate and personal bank accounts controlled by **FRANCISCO PATINO** and his co-conspirators.

72.    **FRANCISCO PATINO** would thereafter transfer proceeds of the health care fraud and illegal kickback scheme to other bank accounts which he also used to conduct further financial and monetary transactions.

73.    **FRANCISCO PATINO** would transfer the proceeds of the health care fraud and illegal kickback scheme at the Patino Medical Practices to fund the creation, development, and operation of the Patino Diagnostic Laboratories.

74.    **FRANCISCO PATINO** and others would conceal and disguise the health care fraud and illegal kickback scheme by transferring the proceeds of the scheme and making payments to falsely portray **FRANCISCO PATINO** as a media personality and legitimate doctor, including but not limited to:

a.    Funding the authorship, publication, and advertisement of a book entitled "The Age of Globesity: Entering the Perfect Storm" about the purported "Patino Diet", which **FRANCISCO PATINO** touted as the "next Atkins Diet";

b.    Paying to appear as the "exclusive medical authority" and be "highlighted" as a medical expert in a nationally syndicated television show.

75.    **FRANCISCO PATINO** and others would disguise the nature, source, and beneficiary of the health care fraud and illegal kickback scheme by entering into sham contracts or employment relationships, causing the illegal kickbacks and bribes to be paid to intermediaries on **FRANCISCO PATINO**'s behalf, and sponsoring boxers, MMA fighters, and UFC fighters, including UFC hall of famers and world champions.

76.    **FRANCISCO PATINO** and others would withdraw hundreds of thousands of dollars in cash and transfer proceeds derived from the conspiracy to pay for real estate, luxury automobiles such as a Cadillac Escalade, and travel to foreign countries such as the Cayman Islands.

## COUNT 6
### (18 U.S.C. § 1956(a)(1)(B)(i) and 2 – Money Laundering)
### D-1 FRANCISCO PATINO

77.    Paragraphs 1 through 40 of the General Allegations section, Paragraphs 44 to 55 of the Manner and Means section of Count 1, and Paragraphs 71 to 76 of Count 6 of this Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

78.    On or about the date set forth below, in Wayne County, the Eastern District of Michigan, and elsewhere, **FRANCISCO PATINO** did knowingly

conduct and attempt to conduct financial transactions affecting interstate and foreign

commerce, which involved proceeds of specified unlawful activity, that is health

care fraud and conspiracy to commit health care fraud, and a conspiracy to defraud

the United States, knowing that the transactions were designed in whole or in part to

conceal and disguise the nature, location, source, ownership, and control of the

proceeds of specified unlawful activity, and that while conducting and attempting to

conduct such financial transactions, knew that the property involved in the financial

transactions represented the proceeds of some form of unlawful activity, as set forth

below:

| Count Defendant | Approximate Date of Payment | Description | Approximate Amount |
|---|---|---|---|
| 6 PATINO | October 16, 2013 | Transfer from Intermediary-1 to MMA Management | $1,000 |

In violation of Title 18, United States Code, Sections 1956 and 2.

## FORFEITURE ALLEGATIONS
### (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461; 18 U.S.C. §§982(a)(1) and (7) – Criminal Forfeiture)

79.     The allegations contained in Count 1-6 of this Superseding Indictment

are re-alleged and incorporated by reference as though fully set forth herein for the

purpose of alleging forfeiture against defendant **FRANCISCO PATINO** pursuant

to Title 18, United States Code, Sections 981 and 982, and Title 28, United States

Code, Section 2461.

80.     Pursuant to Title 18, United States Code, Section 981(a)(1)(C), together with Title 28, United States Code, Section 2461, upon being convicted of the crime charged in Count 1 of this Superseding Indictment, the convicted defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the commission of the offense.

81.     Pursuant to Title 18, United States Code, Section 982(a)(7), upon being convicted of the crimes charged in Counts 1 through 5 of this Superseding Indictment, the convicted defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

82.     Pursuant to Title 18, United States Code, Section 982(a)(1), upon being convicted of the crimes charged in Counts 5 and 6 of this Superseding Indictment, the convicted defendant shall forfeit to the United States any property, real or personal, involved in the charged offenses, or any property traceable to such property.

83.     Specifically, the convicted defendant shall forfeit to the United States, at least the following:

     a)  One Hundred Seventy Four Thousand Thirty Five Dollars and Twenty-Seven Cents ($174,035.27) in funds from Bank of America Business Checking Account No. 0054-0424-6893, held in the name of Renaissance Age Management Institute PLLC;

31

b) Sixty Four Thousand Three Hundred Seventy Six Dollars and Forty-Six Cents ($64,376.46) in funds from Bank of Ann Arbor Business Checking Account No. 800004376, held in the name of Patino Laboratories, LLC;

c) Eight Hundred Ninety Seven Dollars and Seventy-Four Cents ($897.74) in funds from Bank of Ann Arbor Business Checking Account No. 800004384, held in the name of FDRS Diagnostics, PLLC;

d) Eleven Thousand Six Hundred Twenty Five Dollars and Thirteen Cents ($11,625.13) in funds from Bank of America Business Checking Account No. 3750-1982-2894, held in the name of Patino Laboratories, LLC;

e) Seventeen Thousand Two Hundred Seventeen Dollars and Fifty-Seven Cents ($17,217.57) in funds from Bank of Ann Arbor Personal Checking Account No. 801003344, held in the name of Francisco and Corina M. Patino;

f) One Thousand Five Hundred Twenty Dollars and Twenty-Three Cents ($1,520.23) in funds from Bank of America Personal Checking Account No. 3750-1144-2447, held in the name of Francisco and Corina Patino;

g) All Funds on Deposit and All Other Items of Value in John Hancock Life Insurance Policy No. 46-054-337, held in the name of Francisco Patino (Approximately $5,000 value, as of June 27, 2018);

h) All Funds on Deposit and All Other Items of Value in John Hancock Life Insurance Policy No. 46-054-418, held in the name of Francisco Patino (Approximately $5,000 value, as of June 27, 2018);

i) All Funds on Deposit and All Other Items of Value in John Hancock Life Insurance Policy No. 46-054-517, held in the name of Francisco Patino (Approximately $5,000 value, as of June 27, 2018);

j) All Funds on Deposit and All Other Items of Value in John Hancock Life Insurance Policy No. 93-113-241, held in the name of Francisco Patino (Approximately $88,000 value, as of June 27, 2018);

k) All Funds on Deposit and All Other Items of Value in John Hancock Life Insurance Policy No. 81-028-720, held in the name of Francisco Patino; and

l) All Funds on Deposit and All Other Items of Value in John Hancock Life Insurance Policy No. 81-028-897, held in the name of Francisco Patino.

84.    <u>Money Judgment</u>:  Property subject to forfeiture includes, but is not limited to a forfeiture money judgment equal to: at least $120,000,000 in United States currency, in the aggregate, or such amount as is proved in this matter, representing the total amount of proceeds and/or gross proceeds obtained as a result of each defendant's violations as alleged in Counts 1-6 of this Superseding Indictment.

85.    <u>Substitute Assets</u>:  If the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property that cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) as incorporated by Title 18, United States Code, Section 982(b) and/or Title

33

28, United States Code, Section 2461, to seek to forfeit any other property of

**FRANCISCO PATINO** up to the value of such property.

THIS IS A TRUE BILL.

s/GRAND JURY FOREPERSON
Grand Jury Foreperson

MATTHEW SCHNEIDER
United States Attorney

s/REGINA R. MCCULLOUGH                    Date: February 25, 2020
REGINA R. MCCULLOUGH
Chief, Health Care Fraud Unit
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9618
rmccullough@usa.doj.gov

s/MALISA DUBAL
MALISA DUBAL
Assistant Chief
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Avenue, N.W.
Washington, D.C. 20005
(202) 660-2001
malisa.dubal@usdoj.gov

s/JACOB FOSTER
JACOB FOSTER
Assistant Chief
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Avenue, N.W.
Washington, D.C. 20005
(202) 615-6521
jacob.foster@usdoj.gov

| United States District Court<br>Eastern District of Michigan | **Criminal Case Cover Sheet** | Case Number<br>18-cr-20451 |

NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to complete it accurately in all respects.

FILED USDC – CLRK DET
2020 FEB 25 PM 3:18

| **Companion Case Information** | Companion Case Number: 17-cr-20465 |
| This may be a companion case based upon LCrR 57.10 (b)(4)[1]: | Judge Assigned: Hon. Denise Page Hood |
| ☒ Yes    ☐ No | AUSA's Initials: J N F |

**Case Title:** USA v.  Francisco Patino

**County where offense occurred :** Wayne County

**Check One:**   ☒ Felony         ☐ Misdemeanor         ☐ Petty

_____Indictment/_____Information --- **no** prior complaint.
_____Indictment/_____Information --- based upon prior complaint [**Case number:**                    ]
__✓__Indictment/_____Information --- based upon **LCrR 57.10 (d)** *[Complete Superseding section below]*.

**Superseding Case Information**

**Superseding to Case No:** 18-cr-20451          **Judge:**  Hon. Denise Page Hood

☐ Corrects errors; no additional charges or defendants.
☐ Involves, for plea purposes, different charges or adds counts.
☒ Embraces same subject matter but adds the additional defendants or charges below:

| <ins>Defendant name</ins> | <ins>Charges</ins> | <ins>Prior Complaint (if applicable)</ins> |
| Francisco Patino | 18 U.S.C. § 1349<br>18 U.S.C. § 1956(h)<br>18 U.S.C. § 1956(a)(1)(B)<br>(i) and 2 | |

**Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.**

February 25, 2020
Date

Jacob Foster, Trial Attorney
211 West Fort Street, Detroit, MI 48226
Phone: (202) 615 -6521
Fax:    (313) 226 - 0816
E-Mail address: Jacob.Foster@usdoj.gov
Attorney Bar #: CA 250785

---

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, or (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.