UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,                                      Case No. 18-cr-20451

v.                                                   Hon. Denise Page Hood

FRANCISCO PATINO, M.D.

       Defendant.
_____/

**ORDER DENYING DEFENDANT'S MOTION
FOR PRETRIAL RELEASE PENDING TRIAL [ECF No. 111]**

**I.    Introduction**

On March 31, 2020, Defendant filed a Motion for Pretrial Release Pending Trial. ECF No. 111. The Government has filed a response.

**II.    Background**

On June 26, 2018, the grand jury returned an Indictment charging Defendant, a 63-year old man, with one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. §1349, two counts of health care fraud, in violation 18 U.S.C. §1347, one count of conspiracy to defraud the United States, in violation of 18 U.S.C. §371, and one count of receipt of a kickback in connection with a federal health care program, in violation of 42 U.S.C. §1320a-7(b)(1)(A). On February 25, 2020, the Grand Jury returned a Superseding Indictment, which added a wire fraud object to the conspiracy to commit health care fraud, in violation of 18 U.S.C. §1349 (thus increasing the statutory maximum on that count from ten to twenty years). The Superseding Indictment also added one count of conspiracy to commit money

laundering in violation of 18 U.S.C. §1956(h) and a substantive count of money laundering. The conspiracy to commit money laundering count has a statutory maximum of twenty years.

On July 4, 2018, the Magistrate Judge ordered Defendant be detained pending trial. ECF No. 15. The Magistrate Judge found that the Government established by a preponderance of the evidence that Defendant is a flight risk based on the weight of the evidence against Defendant being strong and the fact that Defendant is subjection to a lengthy period of incarceration if convicted. The Magistrate Judge also concluded that the Government established by clear and convincing evidence that there is no condition or combination of conditions that will reasonably assure that Defendant will refrain from obstructing justice.

The Court subsequently denied Defendant's Emergency Motion for a Six-Day Furlough, concluding that there is no condition or combination of conditions of release that would reasonably assure Defendant's appearance if the Emergency Motion was granted. ECF No. 38. The Court stated:

> The Court's review of the Magistrate Judge's Order of Detention and the Pretrial Services' Report establishes that there is no condition or combination of conditions which will reasonably assure the appearance of Patino. Although Patino represents that he is willing to surrender both his U.S. Passport and passport card, he still retains both of them. More significantly, the Government has proffered that Patino lied numerous times during his interview with Pretrial Services, including: (a) grossly misrepresenting the number of recent international trips he took (Patino said two in the last four years, whereas it was 11 trips over the last eight years) and failing to tell Pretrial Services that he had been to the Cayman Islands three times recently; (b) lying or failing to mention his involvement with FDRS Diagnostics; (c) stating that his income was about $300,000/year, when there were years he made about $900,000; and (d) failing to disclose substantial assets in cash, potentially over

2

> $2,000,000, including more than $400,000 withdrawn from accounts in cash in 2017 and 2018.
>
> Patino is 63 years old and is subject to a lengthy period of incarceration (up to 40 years) if convicted. Notwithstanding the fact that his accounts have been frozen by the Government in this country, Patino seemingly has access to substantial sums of money in offshore accounts, including the Cayman Islands where he has traveled in recent years (but failed to mention as much in talking to Pretrial Services). The Court notes that Patino is not asking to attend services in the Eastern District of Michigan, to which his travel generally would be limited even if he were to be released on unsecured bond. Rather, he is seeking to fly to Miami, Florida, far from the Court's jurisdiction and closer to his native Cuba. In addition, Pretrial Services has represented to the Government that Pretrial Services would not be able to effectively supervise Patino in Miami, Florida with a GPS tether, the only method of supervised release proposed by Patino.

ECF No. 38, PgID 288-89.

Defendant later filed a Motion for Revocation of Detention Order. ECF No. 42. The Court denied that motion on March 27, 2019, concluding:

> The Court finds that the Government has shown by a preponderance of evidence that Defendant is a risk of flight and to obstruct justice if he is released. There is evidence that: (1) significant sums of Defendant's funds are not accounted for; (2) Defendant made misrepresentations to Pretrial Services, including regarding his income and his international travel; (3) Defendant made false statements to State of Michigan regulators, including false statements made to state investigators on August 26, 2016 about his use of injections; and (4) Defendant lied at the hearing regarding the ownership of FDRS, specifically, that Defendant knew Campbell had an ownership interest in FDRS for a period of time. A grand jury has determined that there is probable cause to support a finding that Defendant engaged in conduct to mislead and defraud throughout the alleged scheme for which he has been indicted. And, if convicted, it is possible and perhaps likely that Defendant will spend the rest of his life in prison.
>
> The Court also finds that the Government has shown by clear and convincing evidence that Defendant is a danger to the community. As the reports of interviews with numerous witnesses reflect, Defendant has threatened or sought to cause physical harm to several persons, including

Burns, Rashid, an associate of Burns, someone who had cheated Defendant on a deal, and a medical provider who threatened to alert the authorities of Defendant's conduct.

For the reasons stated, after considering the Section 3142(g) factors, the Court finds that no set of conditions will reasonably assure the appearance of the person and the safety of the community and Orders that Defendant remain detained pending trial. *See* 18 U.S.C. § 3142(f).

ECF No. 56, PgID 806-07.

On April 2, 2020, the Court and the parties received an updated Pretrial Services report on Defendant. That updated report concludes:

> As noted in the Order issued by Your Honor on March 27, 2019, "Defendant made misrepresentations to Pretrial Services, including regarding his income and his international travel." Pretrial Services believes the defendant poses a risk of nonappearance and danger to the community. There is no condition or combination of conditions that will reasonably assure the safety of the community and the defendant's appearance in court as requested. Therefore, Pretrial Services respectfully recommends that the defendant be detained.

## III. Analysis

### A. Release from Detention

In his present motion, Defendant states:

> The exponential proliferation of the COVID-19 pandemic in the United States has materially changed the calculus for determining whether a non-violent detainee such as Mr. Patino can safely remain in the general prison population versus on pre-trial release pending sentence. He cannot. Mr. Patino therefore should be immediately released.
>
> Mr. Patino is vulnerable to COVID-19. The Centers for Disease Control and Prevention ("CDC') have issued guidance recommending social distancing, limiting gatherings to groups of less than 10 (if necessary at all), and avoiding all nonessential travel. CDC and medical professionals have also warned that the older [o]r immunocompromised (or both) populations are at increased risk of complications or death resulting from COVID-19. Mr. Patino is

at high risk due to stage 3 chronic kidney disease and hypertension, and his age (63 years old).

>Detention exacerbates the threat of contracting COVID-19. As this Court is certainly aware, and as detailed below, this country is undergoing a serious pandemic. In every aspect of society, individuals and officials recognize that "business per usual" must be dramatically altered; otherwise the impact of the pandemic will be far worse than with such changes. As numerous news reports reflect, officials around the country are recognizing that the criminal justice system is an area requiring immediate systematic change in response to the crisis. The threat to the jail population (and thus indirectly, to the community as a whole) has led jail officials to reduce inmate populations through early release and led prosecuting agencies to rely on summonses, rather than arrest, and to forestall on less serious cases.
>
>This new information bears on the issue of whether Mr. Patino's short term release is appropriate in response to the COVID-19 pandemic and considering the foregoing health and safety concerns posed by incarceration at the FCI Milan Detention facility. The defense requests an order of short-term, temporary release subject to whatever conditions the Court deems appropriate, including location monitoring (home incarceration), and the appointment of a third-party custodian who will reside with Mr. Patino. Further, the global pandemic has resulted in heightened security and travel restrictions worldwide. These restrictions eliminate the risk that Mr. Patino can flee. Nor would he. Federal and state governments throughout the country have take—and are expected to take additional steps to limit international, domestic, and local travel for nonessential purposes.
>
>Keeping Mr. Patino detained at this time unnecessarily and cruelly exposes him to a pandemic that not even the finest hospitals around the world are equipped to handle. The best defense against COVID-19 is to prevent contraction in the first place. His release on the condition of home confinement (and quarantine) to the custody of a custodian—and whatever other reasonable conditions this Court sets— better assures his safety and appearance at trial.

The Government responds that Defendant's motion should be denied. The Government cites the Court's two prior decisions denying Defendant's requests for release from detention, and it asserts that, since the Court's March 27, 2019 Order

denying revocation of the detention order, Defendant's motive to flee and obstruct justice has only increased. As to the latter, the Government accurately states that four persons accused of substantively similar charges for actions tied to Defendant were recently convicted of similar charges, and the grand jury recently returned a Superseding Indictment with additional crimes that carry even longer potential penalties.

In response to Defendant's COVID-19 argument, the Government states that an "individualized assessment of the factors" applicable to defendants is required, not a categorical release on broadly formulated criteria. Relying on *United States v. Martin*, No. 19-cr-140-13, 2020 WL 1274857, at *3 (D. Md. Mar. 17, 2020) (denying release pending appeal on COVID-19 grounds). The Government argues that this Court, like other courts that have recently considered similar arguments, should reject Defendant's attempt to use the COVID-19 epidemic as a basis for pre-trial release. Citing *United States v. Woods,* 4:19-cr-20112 (E.D. Mich. March 28, 2020) (ECF # 258 at 9); *United States v. Martin*, 19-cr-140-13 (D. Md. March 17, 2020) (ECF # 209); *United States v. Isbell*, 1:10-cr-10002 (W.D. Tenn. March 20, 2020) (ECF # 31); *United States v. Gileno*, 3:19-cr-00161 (D. Conn. March 19, 2020) (ECF # 28).

The Government asserts that Defendant does not cite any case law in support of his motion for release and the risk of contracting COVID-19 is "not the sole determinant of whether detention is appropriate." Citing *United States v. Jones*, Crim. No. 17-582, 2020 WL 1323109, at *1 (D. Md. Mar. 20, 2020) (rejecting release requested by incarcerated pregnant detainee on grounds that she is "at increased risk

of contracting COVID-19"). The Government contends that federal courts have generally rejected release based on the risk of contracting COVID-19, focusing on the individual factors applicable to each pretrial detainee and the ability of correctional facilities to respond to the risk of COVID-19 infection. Citing *Martin*, 19-cr-140-13 (denying detention appeal and holding that allegations of defendants medical conditions including high blood pressure, asthma, and diabetes "insufficient to rebut" government proffer that "correctional and medical staff . . . are implementing precautionary and monitoring practices sufficient to protect detainees from exposure to COVID-19."); *Isbell*, 1:10-cr-10002 (denying motion for pretrial release based on COVID-19 in part because the government described "various precautions" the facility had taken to prevent the spread of COVID-19); *Gileno*, 3:19-cr-00161 (denying motion to amend sentence to allow for early release where defendant had not "shown that the plan proposed by the Bureau of Prisons is inadequate to manage the pandemic . . . or that the facility is specifically unable to adequately treat" him.); *Woods*, 4:19-cr-20112, at 9 ("the COVID-19 pandemic cannot be the sole basis for releasing a defendant from custody pending trial; the Court must still consider the Section 3142(g) factors.").

The Government states that efforts to reduce pretrial inmate populations on COVID-19 grounds have centered on low-risk offenders, not persons like Defendant, charged with felonies and facing lengthy terms of imprisonment. The Government states that Defendant is not a low-level offender, contemnor, or probation violator; rather, if convicted of the felony charges against him, he would receive a *de facto* life

7

sentence. The Government submits that releasing this Defendant would signal that almost any health care fraud offender should be entitled to temporary release.

The Government notes that Defendant asserts that he has stage 3 chronic kidney disease and hypertension, but the Government asserts that Defendant provides no evidence to substantiate the existence of this condition or its severity.[1] The Government argues that the courts in *Martin*, *Isbell*, and *Gileno* considered similar requests for release from defendants with serious health conditions, including asthma, high blood pressure, and diabetes; congestive heart failure, chronic obstructive pulmonary disease, a tumor on the spine, and a heart blockage. *Martin*, 19-cr-140-13 at 8; *Isbell*, 10-cr-10002 at 4; *Gileno*, 3:19-cr-00161 at 4. The Government also argues that FDC Milan (Milan or the "Facility") has implemented reasonable precautionary and monitoring practices, including locking down the Facility, in an effort to protect detainees from excessive exposure to COVID-19.[2]

---

[1] The Government accurately states that Defendant raised these same issues at his original detention hearing over one year ago but failed to produce documentation to support his assertions. The Government states that, despite Defendant claims that he is at a high risk of serious illness from COVID-19 (or the many other ailments to which the Defendant's alleged condition might make him more vulnerable), Defendant has not alleged that he asked to be placed in medical isolation.

[2] The Government argues:

> As of March 31, the BOP announced that it was confining all inmates to their cells for 14 days to prevent any potential spread of the virus. https://www.bop.gov/resources/news/pdfs/20200331_press_release_action_plan_5.pdf. The confinement of Defendant will minimize the risk of contracting COVID-19. This is particularly true because Rashid is relatively young and doesn't have any of the medical conditions that place an individual at greater risk from COVID-19.
>
> Previously, officials at FDC Milan instituted other precautionary measures to reduce the risk of infection at the detention center in the interest of both inmates and staff.[1] Sanitation efforts were increased. Quarantine and isolation areas were identified for anyone exhibiting signs or symptoms. Operations and programs were

Finally, the Government argues that the ability of Pretrial Services and other law enforcement officials to safely monitor Defendant if released has been greatly diminished as a result of the COVID-19 epidemic.[3] Citing *Ellis*, Case No. 2:20-cr-20002, at 5-6 ("the Government persuasively argues that granting [defendant's] requested relief may well endanger the public, pretrial services officers, and local law enforcement officers who are already operating under the strain of limited resources.").

The Government argues that Defendant's case is unlike the *Kennedy* case for three reasons. First, it asserts the nature of the offenses at issue here are more serious than the probation violation at issue in *Kennedy*. Second, Judge Levy in *Kennedy* determined that the defendant was not a risk of flight or public safety risk, but noting

---

modified in order to assist with social distancing efforts. A comprehensive procedure for daily health monitoring was established for those inmates who leave the facility and have contact with the community, for example during an emergency medical trip. Additionally, onsite medical services have been available at the Health Services department at FCI Milan, which is currently accredited by the Accreditation Association for Ambulatory Healthcare.

Moreover, the Bureau of Prisons had implemented precautionary measures across all BOP facilities, including FDC Milan, to reduce the risk of a COVID-19 outbreak. Those included rules and limitations on inmate movement and health screening, visitation (suspended), sanitation, *and screening of correctional officers and staff*. https://www.bop.gov/coronavirus/covid19_status.jsp.

[1]Information regarding the precautionary measures at FDC Milan was provided on March 27, 2020 by a Bureau of Prisons (BOP) attorney. The Bureau of Prison also maintains updated information regarding its COVID-19 Action Plan at its public website: https://www.bop.gov/coronavirus/.

ECF No. 475, PgID 6792-93 (emphasis in original).

[3]The Court notes that Pretrial Services and the Probation Department are adequately supervising clients during this crisis, including through the use of new and innovative means of monitoring clients and their conditions.

9

that this Court previously found the opposite in regard to Defendant. Third, unlike the Defendant in *Kennedy*, who provided credible evidence of untreated flulike symptoms and was coughing audibly during the bond review hearing, Defendant has presented no evidence that he is infected or at a specific risk of infection.

The Court is now familiar with the concerns and arguments regarding continued detention in light of COVID-19. As to the concerns regarding COVID-19 that pertain to this Defendant, the Court recognizes that Defendant is 63 years old, and it does appear that Defendant has been treated for high blood pressure (hypertension). *See, e.g.*, ECF No. 52, PgID 702, 739, 741. Both of those factors may place Defendant in a category of persons with a heightened risk if infected with COVID-19. Defendant has not in the past, and has not in support of this motion, shown that he has been diagnosed with Stage 3 kidney disease by any treating physician. *See, e.g.,* ECF No. 52, PgID 701-02 (Transcript of January 25, 2019 Hearing) (admitting that he had not made any formal complaints at Milan, where he was housed, related to Stage 3 kidney disease; he had only talked to the doctor there about it). Accordingly, the Court does not consider Defendant's assertion of kidney disease in determining Defendant's motion.

As set forth above, this Court has previously denied Defendant's release from detention for a number of reasons, including the charges against him, his threats against others, the numerous instances of lying to government agencies, and unaccounted for sums of money. In those instances, the Court concluded that there was clear and convincing evidence that there were no conditions that could reasonably

assure the safety of the community and Defendant's appearance. Those reasons for continued detention remain relevant and controlling, even after consideration of the effects and dangers of COVID-19.

Defendant is facing a number of felony charges, for which he will likely serve the rest of his life in prison if convicted. Four other defendant physicians, many of whom testified that they were advised by or learned from Defendant, were recently convicted of health care fraud, in part for administering medically unnecessary and painful facet joint injections to their patients, the same type of conduct for which Defendant is being prosecuted. It is also true that one of his alleged co-conspirators, Mashiyat Rashid, testified against those four defendants and, Defendant believes, will testify against Defendant at his trial.

Based on Defendant's history of interaction with and lies to governmental agencies, his threats of harm to others, the charges against him – in particular the sentences he faces if convicted, the risk of danger to the community, and his motivation for and risk of non-appearance in the future due to the length of his sentence and other reasons noted previously, the Court concludes that Defendant is not a good candidate for temporary release from detention, even during the current COVID-19 pandemic. Accordingly, the Court denies Defendant's request for release from detention pending trial.

**B.    Directive to the BOP**

Defendant alternatively requests an order from this Court directing the United States Marshal (Bureau of Prisons) to ensure the following necessary life-saving

safety measures are in place to protect him (and other federal pretrial detainees) from the devastating impact of COVID-19:

> 1. Screen Defendant for symptoms of COVID-19 daily and if there signs or symptoms, administer a COVID-19 test kit within 24 hours.
>
> 2. Ensure Defendant remains at least six feet away from any other person unless necessary to administer health care or in the course of an emergency.
>
> 3. No shared housing or transportation that requires proximity to others of less than six feet.
>
> 4. Provision of hygiene items, to include at a minimum: tissues, hand sanitizer containing at least 60% alcohol, disinfecting wipes, soap, disposable latex gloves and face masks.
>
> 5. All areas where the defendant is housed or transported shall be cleaned and disinfected prior to the defendant being housed or transported there. Afterward, whenever a person other than the defendant enters the area, the area shall be cleaned and disinfected.
>
> 6. Clean and disinfect his cell every 24 hours, at a minimum, regardless of whether anyone else has entered the area. Defendant shall also be permitted to disinfect his own cell with disinfecting wipes.
>
> 7. Defendant's clothing, linens, towels and any other porous items shall be cleaned and disinfected daily.
>
> 8. Defendant shall be permitted to wash his hands regularly and thoroughly with an alcohol-based hand rub or soap and water.

As set forth above, Defendant is housed at Milan and that Facility has undertaken numerous safeguards against interaction of prisoners, namely locking prisoners down in their cells. Under those safeguards, it does not seem likely that Defendant will interact with other persons, except for Facility personnel, who will be screened and monitored. And, as a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons. *See, e.g., Wolff v. McDonnell*, 418 U.S. 539, 556

(1974) ("We should not be too ready to exercise oversight and put aside the judgment of prison administrators."); *Crowe v. United States*, 430 F. App'x 484, 485 (6th Cir. 2011) ("a federal court lacks authority to review a decision by the BOP to not seek a compassionate release for an inmate"); *Vida v. Cage*, 385 F.2d 408, 409 (6th Cir. 1967) ("The prison authorities [have] the right to adopt reasonable restrictions governing the conduct of inmates [or visitors] and the Courts ought not to interfere with prison operations in the absence of constitutional deprivation.").

For the foregoing reasons, and in the absence of evidence (or even allegations) that the Bureau of Prisons at Milan is not endeavoring to ensure the safety of its prisoners, generally – and Defendant, specifically, the Court will not order the Bureau of Prisons at Milan to provide specific care to Defendant, some of which may not even be possible because of other dangers.

## IV. Conclusion

Accordingly, and for the reasons stated above,

IT IS ORDERED that Motion for Pretrial Release Pending Trial [ECF No. 111] is **DENIED**.

IT IS ORDERED.

Dated: April 6, 2020

s/Denise Page Hood  
DENISE PAGE HOOD  
UNITED STATES DISTRICT JUDGE