UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,                    No. 2:18-cr-20451-DPH-RSW

v.                                           Hon. Denise Page Hood

D-1 Francisco Patino,

       Defendant.

---

# UNITED STATES' MEMORANDUM
# IN AID OF SENTENCING

---

The United States of America, by and through its undersigned counsel, submits this memorandum to the Court to aid in sentencing Francisco Patino ("defendant"). The United States requests the Court sentence the defendant to a term of 360 months' imprisonment, impose a restitution judgment in the amount of $30,348,798.68, a special assessment of $600, and impose a three-year term of supervised release.

The government's sentencing recommendation is warranted for a number of reasons. First, this health care fraud scheme was one of the most egregious in United States history. The defendant developed and perpetuated a massive fraud scheme involving more than a dozen physicians and affecting hundreds of patients. As a

result, patients were harmed, Medicare was bilked out of tens of millions of dollars, and millions of medically unnecessary opioids were prescribed.

Second, no one was more responsible for the impact caused by this scheme than the defendant. The "shots-for-pills" *quid pro quo* illustrated throughout Patino's trial and throughout the Tri-County trial[1] was Patino's protocol. Not only did Patino bring his protocol to Mashyiat Rashid's ("Rashid") clinics, but he also trained and instructed other physicians to follow his protocol. Patino expanded his operation by luring physicians with no experience in the field of pain management, like Dr. Weaver and Dr. Yangouyian, into his scheme with the promise of more money and easier work.

Third, the defendant was an educated and trained licensed medical professional who chose to violate his Hippocratic oath by placing profits above patients. He administered thousands of medically unnecessary, painful injections and he undoubtedly caused numerous patients to become addicted, or further their addiction, to opioids. The defendant knew the back injections that he and the doctors he trained were repeatedly administering were medically unnecessary. During the trial of four Tri-County physicians, Rashid, Patino's business partner, testified that Patino knew that he and the other doctors were administering trigger point injections, but billing

---

[1] United States of America v. Spilios Pappas, Joseph Betro, Tariq Omar, and Mohammed Zahoor, 17-20465.

2

for facet joint injections. Trial Tr. January 22, 2020, v.6, p.25. The reason why Patino chose to bill the injections as facet joint injections was simple – they were the highest reimbursing. *Id.* at 29-30. Patino told Rashid that he believed their false billing practice would not be detected because they were actually administering the injections and trigger point and facet joint injections have many similarities. *Id.* at 25. Patino took further steps to cover up his crimes after going through an audit of a Tri-County practice in approximately 2013. Patino learned from the audit that in order to get paid by insurance providers, patients needed to experience symptoms for a certain period of time before receiving facet joint injections and patients needed to feel a minimum level of relief from the injections. *Id.* at 107-110. After learning these lessons from the audit, Patino drafted a memo to all Tri-County Physicians and Staff instructing them that all patient files needed to reflect patients experienced symptoms for at least three months and all patients experienced at least 75% pain relief from the injections. *Id.* (*See also* GX918). In fact, Patino told Rashid that following these instructions would make the false billings "bulletproof." *Id.* at 108.

## I.     FACTUAL BACKGROUND

On September 21, 2021, a jury convicted the defendant of all six counts charged in the Superseding Indictment. As a result, the defendant faces a statutory maximum sentence of 1020 months' imprisonment. The following evidence

presented at trial highlights the egregious nature of the defendant's criminal enterprise:

Over the course of approximately five years, Patino billed Medicare more than $50 million for facet joint injections alone[2] – more than double any other physician within his field in the Unites States. (GX 211 – Peer Data). Further, as depicted in the table below[3], Patino billed for more than 69,000 injections, or units, also the most in the country. In fact, the second and third ranking physicians with the highest number of injections billed to Medicare in the country were the defendant's own trainees and co-conspirators, Spilios Pappas and Abdul Haq.

| Rendering | Min Date | Max Date | HIC Count | Claim Count | Units Billed | Units per | Total Billed |
|-----------|----------|----------|-----------|-------------|--------------|-----------|--------------|
| Patino, Frank | 03-Jan-2012 | 31-Jul-2017 | 672 | 15,759 | 69,686 | 103.70 | $50,235,915.39 |
| Pappas, Spilios | 18-Dec-2012 | 11-Jul-2017 | 575 | 10,195 | 31,333 | 54.49 | $11,928,455.00 |
| Haq, Abdul | 03-Jan-2012 | 01-Feb-2017 | 715 | 7,943 | 25,348 | 35.45 | $9,248,685.00 |

The Centers for Medicare and Medicaid Services ("CMS") analyzed Patino's outpatient office visit claims and determined that over a 9-month time frame in 2014, he billed Medicare for the highest reimbursing office visit (CPT Code 99215) more than 95% of the time, while the regional and national average amongst Patino's peer

---

[2] Injections billed as one of the following CPT codes: 64490, 64491, 64492, 64493, 64494, 64495.
[3] This table was created from the data contained in GX211.

group billed the highest reimbursing office visit code less than 5% of the time. (GX 303).



**COMPARATIVE BILLING REPORT**
**Provider: FRANK PATINO M.D.**
**Specialty: Internal Medicine**
**Services rendered: 01/02/2014-09/30/2014**

Over the course of *more than eight years*, Patino billed Medicare for services requiring more than 24 hours in a day approximately 67% of the time. (GX 219 – Time Study Analysis). That is, on more than 1300 days, Patino claimed he was working more than 24 hours per day, including at least 10 days in which he purportedly worked more than 200 hours per day. This analysis doesn't even encompass the totality of his fraudulent billings as it only includes Medicare claims and does not include any claims submitted to private insurance providers.

| Excessive Days Time Summary | | | | |
|---|---|---|---|---|
| **Total Time** | **Total Days** | **Total Claims** | **Total Payments** | **% of Days Billed** |
| 8 - 15.99 hours | 158 | 2181 | $498,650.19 | 8.17% |
| 16 - 23.99 hours | 266 | 5473 | $1,429,304.87 | 13.75% |
| **23.99 or more hours** | **1303** | **43340** | **$13,714,793.92** | **67.34%** |
| Totals | 1727 | 50994 | $15,642,748.98 | 89.25% |
| | | | | GX 219 |

Patino prescribed dangerous amounts of opioids to his patients. Over the course of approximately five years, Patino steadily *increased* the potency of the opioids he prescribed, ultimately making him the top prescriber of 30 mg oxycodone within the state of Michigan. (GX46 – Average Daily MME Chart) (GX 406-1 – Top Practitioner Report Oxycodone 30mg 2016 and 2017). At trial, the government's expert, Dr. Scott Kreiner, testified that the CDC recommends that physicians do not prescribe more than 50 Morphine Milligram Equivalents ("MME") per day to a patient and never more than 90 MME per day. ECF No. 214, PageID 8432-33, Trial Tr. As the below graph shows, the defendant not only far exceeded both the

recommended 50 MME level and the "never more than" 90 MME level, but he also continued to increase the potency of his prescriptions over time.



GX 046

Finally, Patino expanded the scope of his enterprise by engaging in a kickback conspiracy with Rashid, Joshua Burns ("Burns"), and multiple laboratories. Patino used Burns to funnel kickback payments from the labs back to him. Patino then laundered his illicit proceeds to Burns and other professional mixed martial art fighters to promote himself and his book. Trial Tr., Sept. 20, 2021, v.8, p.9-57.

## II.   PROCEDURAL HISTORY

Patino was charged on June 26, 2018, in a five-count Indictment and detained at his initial appearance. Magistrate Judge Anthony P. Patti specifically found that Patino lied to Pretrial Services, withdrew more than $1,000,000 in cash, intimidated witnesses, and took advantage of thousands of patients. ECF No. 15 – Order of Detention.

On December 4, 2019, Patino filed a motion seeking to revoke the detention order. ECF No. 42. This Court denied that motion, finding there was clear and convincing evidence that Patino was a danger to the community and that no set of restrictions would reasonably assure his appearance. ECF No. 56.

On February 25, 2020, a six-count Superseding Indictment was filed. ECF No. 100. The defendant's jury trial commenced on August 12, 2021, and the jury returned a verdict of guilty on all counts on September 21, 2021.

## III.   SENTENCING GUIDELINES

The government agrees with the Probation Department's calculation of the Guidelines range, which is as follows:

- Base Offense Level: 7 (U.S.S.G. § 2B1.1(a)(1))

- Specific Offense: +2 (U.S.S.G. § 2S1.1(b)(2)(B))

- Intended Loss >$65,000,000: +24 (U.S.S.G. § 2B1.1(b)(1)(M))

8

- HCF Enhancement: +4 (U.S.S.G. § 2B1.1(b)(7)(B)(iii))

- Sophisticated Means Enhancement: +2 (U.S.S.G. § 2B1.1(b)(10)(C))

- Vulnerable Victim: +2 (U.S.S.G. § 3A1.1(b)(1))

- Large Number of Vulnerable Victims: +2 (U.S.S.G. § 3A1.1(b)(2))

- Aggravating Role: +4 (U.S.S.G. § 3B1.1(a))

- Abuse of Trust: +2 (U.S.S.G. § 3B1.3)

Total Offense Level: 49 (Life)

## IV.   LOSS AMOUNT

The defendant was convicted of a health care fraud conspiracy that existed from at least December 2008 through July 2018. Patino was the owner of RenAMI, FDRS, and Patino Labs. He was the CEO at Global Quality and served as the Medical Director at the Tri-County clinics, including Aqua Therapy and Pain Management, Global, and the Tri-County Physicians Group. Patino expanded his scheme by conspiring with Rashid and others and billing Medicare and Blue Cross Blue Shield of Michigan ("BCBS") for his shots-for-pills protocol from each of the entities below:

- Amount billed by Patino's pain clinic (RenAMI) to Medicare and BCBS:
    - (Medicare) $72,630,447.77 ($12,858,235.28 actual loss) (GX208)
    - (BCBS) $4,124,412.81 ($786,029.25 actual loss) (see Gov't Ex. 1)[4]

---

[4] The BCBS billed and paid amounts were determined by compiling all of the claims submitted by RenAMI to BCBS for services purportedly provided by Dr. Weaver between February 1, 2016 and December 31, 2017. Weaver was not employed at RenAMI during this timeframe.

- Amounts billed by Patino's co-conspirators' pain clinics (Tri-County Physician Group, Aqua Therapy and Pain Management, and Global Quality[5]) to Medicare through the date of Patino's disassociation with those entities, October 5, 2013:
  - $11,812,519.76 from Tri-County ($4,637,064.99 actual loss) (GX210)
  - $9,497,963.43 from Aqua Therapy ($3,716,883.36 actual loss) (GX204)
  - $8,656,257.31 from Global ($3,278,006.04 actual loss) (GX206)

- Amounts billed by laboratories (Ameridrug, Synergy, FDRS, and Patino Labs) to Medicare for samples referred by Patino:
  - $3,077,430 from Ameridrug ($1,884,370.43 actual loss) (GX203)
  - $2,663,884.38 from FDRS ($922,197.42 actual loss) (GX205)
  - $1,785,122 from Patino Labs ($1,012,369.88 actual loss) (GX207)
  - $7,287,096.50 from Synergy ($1,253,642.03 actual loss) (GX209)

- **Total Amount Billed: $121,535,133.96**
- **Total Actual Loss: $30,348,798.68**

The Probation Department correctly used the billed amounts to determine the intended loss. In the context of health care fraud offenses, the Guidelines confirm the total amount of fraudulent billing shall constitute the amount of intended loss:

> In a case in which the defendant is convicted of a Federal health care offense involving a Government health care program, the aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the intended loss, *i.e.*, is evidence sufficient to establish the amount of the intended loss, if not rebutted. U.S.S.G. § 2B1.1 cmt. n.3(F)(viii).

---

[5] Although Global Quality is grouped here with the co-conspirator clinics, Patino was listed as the CEO of Global Quality at various points in time, along with Mashiyat Rashid.

Intended harm is based on the amount billed. *Id.* at n.3(F)(viii). Thus, even where, as here, intended loss exceeds actual loss, the amount billed does not overstate the Guidelines range because the defendant's offense level must account for both the defendant's relative culpability and actual harm[6]. That is why the Guidelines define loss as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt.3(A). Indeed, this Court has correctly ruled that the amount billed is the appropriate measure of loss in deciding the issue of loss in connection with the sentencings of Rashid and other defendants in this scheme.

## V.    ANALYSIS OF RELEVANT 3553(a) FACTORS

Title 18, United States Code, Section 3553(a), provides numerous factors that the Court is to consider in sentencing the defendant. Factors pertinent to the instant offense are discussed below, numbered as they are in Section 3553(a).

### (1)    The nature and circumstances of the offense and the history and characteristics of the defendant.

The nature and circumstances of the defendant's offenses are disturbing. Patino placed hundreds, if not thousands, of patients in danger, sacrificing their well-being so that he and his co-conspirators could support their lavish lifestyles

---

[6] Here, even if the loss amount was based on an actual loss of $30,348,798, the total offense level would decrease 2 levels to 47, resulting in the same Guidelines range (Life) as when using the intended loss of $121,535,133.

with proceeds stolen from the Medicare Trust Fund. The defendant's willingness to force patients to accept painful injections by making their opioid prescriptions contingent on their acceptance of injections is despicable. At the defendant's trial, Mr. Gladstone, a BCBS member, testified about his experience as a Patino patient. ECF 212, PageID 8337-8360. He testified that he sought treatment at RenAMI to get help for his back pain. *Id*. at 8339. The defendant prescribed pain medication and gave him 6 injections in his back every 30 days for approximately 5 years. *Id* at 8340-8342. Mr. Gladstone testified that the injections did not help his pain, and, in fact, caused him pain and resulted in the monthly appearance of 6 bruises "the size of a quarter to a half-dollar, six bruises up and down my spine, both sides." *Id*. at 8342. When asked why he continued to suffer this pain every 30 days for years, Mr. Gladstone succinctly described the defendant's protocol – "the medication I received helped my pain, and to get the medication you get the shots." *Id*.

Mr. Malysa, a disabled Medicare beneficiary suffering from Multiple Sclerosis, among other ailments, was also a Patino patient. ECF No. 212, PageID 8361-62.  Mr. Malysa testified that he saw Patino for several years and was prescribed numerous pain medications, resulting in Mr. Malysa becoming addicted to fentanyl. *Id*. at 8363, 8376. To fuel his addiction, Mr. Malysa continued seeing Patino because he didn't believe any other doctor would prescribe him as much

12

fentanyl as the defendant prescribed him. *Id.* at 8377. He also continued receiving six "pokes" in the back because he knew that was required to get his prescriptions. *Id.* at 8364. As Mr. Malysa testified, "[m]ost of the time I didn't want to have the injections, but one of the nurses said that, you know, that we don't just give the prescription away, you know, like they don't give the scripts away. You have to do something else for it like the injections." *Id.* at 8371.

The defendant took steps to cover up his shots-for-pills scheme. He falsified patient files to reflect that patients were feeling an 80% reduction in pain as a result of the back injections. ECF No. 212, PageID 8351. He also instructed his other physicians to do the same, as stated in his Staff Memo dated January 25, 2013. (GX 918). Patino knew he couldn't put the truth in the patient files – that the injections did not provide at least 75% relief in pain – because then he may not get paid. Trial Tr. January 22, 2020, v.6, p.109.

On occasions when the defendant granted a reprieve to his patients from the painful shots, he still made sure he was paid – billing Medicare for injections even when the injections were not provided. (*See* ECF 211, PageID 8156 – Trial Tr. of testimony from Rosemarie Bartys-Loftis stating Patino prefilled prescriptions when he traveled out of town and RenAMI billed for back injections when those injections were not provided.) There are no redeeming qualities to be taken from

Patino's medical practice. His appalling treatment, for more than a decade, of patients desperate for help speaks volumes about his character.

**(2)   The need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence; and (C) to protect the public from further crimes of the defendant;**

The appropriate punishment must reflect the seriousness of the offense, afford adequate deterrence, promote respect for the law, and provide just punishment for the offense. Health care fraud is a substantial problem nationwide and the National Health Care Anti-fraud Association, an organization composed of both public and private health insurers and regulators, conservatively estimates that three percent of all health care spending in the United States is lost due to fraud.

The defendant's punishment should take into account not only the scope and seriousness of his own criminal conduct, but also the need to deter other physicians from seeking to profit from the public health system at their patients' expense.  The Sixth Circuit Court of Appeals has emphasized that "economic and fraud-based crimes . . . are prime candidates for general deterrence" because these crimes "are more rational, cool, and calculated than sudden crimes of passion or opportunity." *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013) (*quoting United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006)).   In this case, specific deterrence is necessary to prevent the defendant from committing more crimes. Patino committed

crimes for at least a decade and the punishment he receives should ensure that the public is forever protected from any further crimes by the defendant.

**(5)    Any pertinent policy statement issued by the United States Sentencing Commission ("U.S.S.C.")**

The United States is unaware of any pertinent policy statements issued by the U.S.S.C.   However, the Patient Protection and Affordable Care Act ("PPACA"), enacted in March 2010, provides the most recent evidence of congressional intent in this area of the law.   PPACA specifically provides for increased sentences for health care fraud offenses, and further requires the U.S.S.C. to "ensure that the Federal Sentencing Guidelines and policy statements - (i) reflect the serious harms associated with health care fraud and the need for aggressive and appropriate law enforcement action to prevent such fraud; and (ii) provide increased penalties for persons convicted of health care fraud offenses in appropriate circumstances."   Pub. L. No. 111-148, § 10606(a)(3).

**(6)    The need to avoid unwarranted sentencing disparities among defendants with similar records**

This sentencing factor is intended to address national sentencing disparities, and it is widely recognized that a Guidelines sentence is the best way to avoid such disparities.   *United States v. Smith*, 564 F. App'x 200, 205 (6th Cir. 2014) (stating that "one of the fundamental purposes of the Guidelines is to help maintain national

uniformity in sentences, and considering that most sentences are within the Guidelines, the Guidelines themselves represent the best indication of national sentencing practices"); *Rita v. United States*, 551 U.S. 338 (2007).

The only individual similarly situated to Patino in this massive scheme is Rashid. Patino and Rashid started this operation together, with Rashid leading the business side and Patino in charge of the medical side. One obvious difference, however, is that Patino was the one with an ethical and professional obligation to the patients. Yet, it was Patino who created the shots-for-pills protocol that caused pain and harm to so many patients in need of real help. Rashid, on the other hand, ultimately took responsibility for his crimes. He pled guilty and cooperated extensively with government by testifying at the trial of his co-defendants and assisting the government in the prosecution of individuals in other cases. After receiving credit for his acceptance of responsibility, Rashid's Guidelines range was life in prison, with a statutory maximum of 360 months. The government filed a 5K1.1 motion requesting the Court sentence Rashid below the Guidelines range to a term of 216 months' imprisonment, 40% below the statutory maximum. The Court granted the government's motion and sentenced Rashid to 180 months.

Patino should receive a sentence significantly longer than Rashid. Patino was the medical professional. He personally injected the needles and prescribed the

16

opioids. He continued the scheme on his own after 2013 and collected millions of dollars from Medicare from the fraudulent claims he caused to be submitted. He has not accepted any responsibility for his actions. Therefore, Patino should be sentenced to prison for 360 months, which is the length of time Rashid faced before the government's 5K1.1 motion was granted.

## Conclusion

Based on the considerations above, the United States respectfully requests that this Court: (1) find the defendant's offense level to be 49; (2) impose a sentence of 360 months' imprisonment; (3) impose restitution in the amount of $30,348,798.68, jointly and severally with his co-conspirators in the fraud; (4) order a special assessment of $600; and (5) order a three-year term of supervised release.

Respectfully submitted,

Respectfully submitted,

DAWN N. ISON
United States Attorney

GLENN S. LEON
Chief
U.S. Department of Justice
Criminal Division, Fraud Section

s/STEVEN SCOTT
STEVEN SCOTT

17

KATHLEEN COOPERSTEIN
Trial Attorneys
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Ave., N.W.
Washington, D.C.  20005
Phone: (202) 262-6763
Email: steven.scott@usdoj.gov

Date:  January 6, 2023

18

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 6, 2023, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to counsel for Defendant.

s/Steven Scott_____
Steven Scott
Trial Attorney
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Ave., N.W.
Washington, D.C. 20005

Date: January 6, 2023          E-Mail: Steven.scott@usdoj.gov